IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CURTRINA MARTIN, et al., | |
| Plaintiffs, | |
| v. | Civil Action File No. 1:19-CV-04106-JPB |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

| | |
|---|---|
| HILLIARD TOI CLIATT, | |
| Plaintiff, | |
| v. | Civil Action File No. 1:19-CV-04180-JPB |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| 600 United States Courthouse | KURT R. ERSKINE |
| 75 Ted Turner Drive, SW | ACTING UNITED STATES ATTORNEY |
| Atlanta, Georgia 30303 | |
| Telephone:  404-581-6228 | s/ Aaron J. Ross |
| Facsimile:  404-581-6181 | Aaron J. Ross |
| aaron.ross@usdoj.gov | Assistant United States Attorney |
| | Georgia Bar No. 461981 |

## I.    INTRODUCTION

These cases arise out of the attempted execution of search and arrest warrants at the wrong home – Plaintiffs' home – on October 18, 2017, at approximately 5:00 a.m.  Plaintiffs purport to assert a Fourth Amendment claim for illegal entry, detention, and false arrest against FBI Special Agent Lawrence Guerra pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and tort claims against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), *et seq.* (the "FTCA").

As discussed below, however, the undisputed material facts show that Guerra engaged in significant preparations prior to the attempted warrant executions and that his conduct at all times was reasonable and well above the standard required under "clearly established" law.  What is more, the conduct at issue here is the exact type of conduct that both this Court and the Eleventh Circuit have held is subject to the FTCA's discretionary function exception.  As a result, qualified immunity bars Plaintiffs' claims against Guerra, this Court lacks subject matter jurisdiction over certain of Plaintiffs' FTCA claims, and Plaintiffs' remaining FTCA claims fail as a matter of law.

Accordingly, Defendants are entitled to summary judgment.

## II.    FACTUAL BACKGROUND

### A.    The Parties

Plaintiffs are Curtrina Martin and her minor child, G.W., in *Martin*, and Hilliard Toi Cliatt, III, in *Cliatt*.  *Martin*, Doc. 1; *Cliatt*, Doc. 1.  At all relevant times, Plaintiffs lived at 3756 Denville Trace SW, Atlanta, Georgia (hereinafter, "3756 Denville").[1]  Deposition of Hilliard Toi Cliatt ("Cliatt Dep.") (**Ex. A**), at 10:5-24; Deposition of Curtrina Martin ("Martin Dep.") (**Ex. B**), at 11:11-12:13.

Defendants are the United States of America and FBI Special Agent Lawrence Guerra.  *Martin*, Doc. 1; *Cliatt*, Doc. 1.  Other than a temporary assignment in Washington, D.C. in 2009 and 2010, Guerra has served as a Special Agent in the FBI's Atlanta Field Office since 1997.  Deposition of Lawrence Guerra, Mar. 31, 2021 ("Guerra Dep.") (**Ex. C**), at 13:5-13:23.  As part of his collateral duties, Guerra also has served as an FBI tactical and firearms instructor and as a member of the FBI SWAT team, including as a SWAT team leader.  *Id.* at 16:25-17:21, 20:25-22:3, 26:14-24.  As a Special Agent, including as a SWAT team leader, Guerra does not supervise other agents.  *Id.* at 17:22-19:2, 26:25-27:4.

---

[1] Although this Court's Standing Order Nos. 04-02 and 08-02 direct parties to omit or redact home addresses, the addresses identified herein already are identified in Plaintiffs' Complaints and are central to the issues alleged.  *Martin*, Doc. 1 ¶¶ 10, 12; *Cliatt*, Doc. 1 ¶¶ 9, 11.

### B.    The Underlying FBI Operation

In 2015, the FBI initiated an operation concerning violent gang activity in Georgia, involving murder, robbery, drug trafficking, and firearm possession by numerous individuals, including Joseph Riley.  Deposition of Joshua Thompson ("Thompson Dep.") (**Ex. D**) ¶¶ 22:9-22:4, 26:19-24; *United States v. Evans, et al.*, No. 1:16-CR-00427-AT-JKL (N.D. Ga.) (Doc. 33).  The operation resulted in a criminal indictment against Riley and 29 others.  *Evans*, No. 1:16-CR-00427-AT-JKL (N.D. Ga.) (Doc. 33).  Arrest warrants then were issued against the criminal defendants, including Riley, and search warrants were issued for seven locations, including Riley's address of 3741 Landau Lane SW, Atlanta, Georgia (hereinafter, "3741 Landau").  *See id.* (Docs. 78-107); Declaration of Deborah Crum ("Crum Decl.") (**Ex. E**), Exs. 1 & 2.  Riley's arrest warrant ordered his arrest "forthwith," and the search warrant for 3741 Landau authorized execution "at any time day or night" on or before October 29, 2017.  Crum Decl., Exs. 1 & 2.  The affidavit requesting the search warrant stated that the warrant would be executed at approximately 5:00 a.m. "to better ensure officer safety."  *Id.*, Ex. 3.

### C.    The FBI's Planning of the Warrant Executions

The FBI began planning the warrant executions before the indictment and warrants had been issued.  Thompson Dep., at 22:9-23:16; Guerra Dep., at 52:14-

53:11, 55:21-56:5.  Given the magnitude of the operation, a large portion of the

FBI's Atlanta Field Office, including Guerra, was involved.  Deposition of

Jennifer Bazzell ("Bazzell Dep.") (**Ex. F**), at 33:24-34:22; Guerra Dep., at 52:14-

53:11, 58:3-16.  The planning included assigning teams, coordinating with local

law enforcement agencies and other FBI field offices, and preparing target sheets.

*Id.*  As to 3741 Landau, it also included using intelligence (such as geolocation

data)[2] to associate Riley to that address and physical surveillance on September

21, 2017, and October 3, 2017.  Thompson Dep., at 38:14-42:10 & Ex. 26.

During this process, the FBI determined that, while not all of the targets

posed a high risk of violence or injury to FBI agents, based on Riley's history,

Riley and 3741 Landau did.  *Id.* at 26:3-24; Guerra Dep., at 32:23-33:4, 52:14-53:11;

Bazzell Dep., at 34:13-24.  The FBI thus decided that a FBI SWAT team would be

assigned to make entry at 3741 Landau and secure it for other FBI personnel to

execute the warrants.  Thompson Dep., at 26:3-27:17, 51:16-24; *see also* Deposition

of Michael Lemoine ("Lemoine Dep.") (**Ex. H**), at 10:20-11:14 (explaining that

---

[2] *See* Deposition of Lawrence Guerra, Aug. 4, 2021 ("Guerra Dep. II") (**Ex. G**), at
12:13-20.  Riley's geolocation data was the subject of a prior discovery dispute.
*See* Doc. 80.  As Guerra testified at his re-opened deposition, geolocation data is
"not a navigational system" or navigational tool for executing a warrant but is an
"investigative technique" or "form of intel" used by the case agent (not the
SWAT team leader).  Guerra Dep. II, at 21:10-22:7, 23:21-24:14, 25:21-26:3, 29:3-16.

SWAT team only are deployed to high-risk situations); Deposition of Gregory Donovan ("Donovan Dep.") (**Ex. I**), at 21:12-22:15 (same).

For each SWAT location, the FBI prepared, in addition to a general Operation Order, a SWAT Addendum to the Operation Order.  Guerra Dep., at 34:21-35:21; Crum Decl., Exs. 4 & 5.  The Operation Order provided case background and specified, among other things, that the seven search warrants and 17 arrest warrants (including the Riley and 3741 Landau warrants) would be executed simultaneously on October 18, 2017, at 5:00 a.m.  Crum Decl., Ex. 4.  The SWAT Addenda set forth SWAT-specific tactical considerations, such as mechanically breaching the front door and deploying flash bangs within the team leader's discretion, and provided that the "SWAT teams will need to achieve a near simultaneous start to ensure surprise is achieved."  *See id.*, Ex. 5.

The SWAT Addendum for 3741 Landau also included more specific information regarding Riley and that location.  *Id.*  For example, it identified 3741 Landau as a "two-story, corner residence" and provided a large photograph of the front of the residence, an overhead image of the neighborhood with a pin denoting 3741 Landau, and directions to the property from downtown Atlanta with a corresponding map.  *Id.*  As to Riley, it provided photographs, gave his

physical description, and identified his alleged history of violence and gun possession, including his participation in a prior shooting.  *Id.*

The photograph of 3741 Landau used in the SWAT Addendum was taken by FBI Task Force Officer Joshua Thompson during his surveillance on October 3, 2021.  Thompson Dep., at 39:20-46:23 & Exs. 26 & 27.  Thompson was one of the case agents for the overall operation and the assigned Case Agent for Riley and later would participate in the warrant executions at 3741 Landau.  *Id.* at 27:18-22, 24:16-25:22, 66:22-68:13.  In addition to driving by and discreetly taking photographs of the residence, Thompson conducted surveillance of 3741 Landau for more than two hours on October 3, 2017, from "about 200 yards away using binoculars from a side street" out of concern for being seen.  *Id.* at 40:13-19, 44:6-9, 47:20-48:5 & Exs. 26 & 27.

**D.    Guerra's Additional Preparations Prior to October 18, 2017**

From October 1, 2017, to October 13, 2017, Guerra was on a humanitarian mission for the FBI in Puerto Rico, following Hurricane Maria.  Guerra Dep., at 55:21-56:7.  While he was away, the FBI assigned Guerra to be the SWAT Team Leader for the warrant executions at 3741 Landau.  *Id.*  He was provided with, among other things, the names of the other SWAT team members assigned to 3741 Landau, the Operation Order and a SWAT Addendum with additional

photographs of 3741 Landau, and additional background on Riley.  *Id.* at 57:17-58:25; Bazzell Dep., at 46:12-47:1, 53:14-54:22, & Exs. 39 & 42.

After returning from Puerto Rico and in preparation for the warrant executions, Guerra conducted a "site survey" (or drive-by) of 3741 Landau, during which he took photographs and identified specific features that, based on his experience, would be helpful to the SWAT team entry and allow him to identify the property in the early morning of the warrant executions.  Guerra Dep., at 60:23-61:3, 65:14-67:18, 73:25-77:20, 82:1-12, 84:17-86:12.  Because Riley and the gang were known to be violent and surveillance conscious, Guerra limited his time outside the house.  *Id.* at 78:9-79:2.  Nevertheless, Guerra noted that the house was beige and split-level, located on a corner lot, had a driveway/garage on a separate street that ran perpendicular to the front door, and had a large tree in the front corner of the property.  *Id.* at 73:25-77:20, 84:17-86:12, & Ex. 3 ¶¶ 16-18.  He also observed that the home had a tight stairway and stoop leading to the front door and windows on either side that would make tactical entry difficult and provide little cover to the agents in case of gunfire.  *Id.*

After completing the site survey, Guerra drove to and chose a staging area (or meet-up location) for the warrant executions, which he communicated to the SWAT team members and other personnel who would be participating.  *Id.* at

65:14-25, 66:23-67:3.  He also wrote tactical notes, which specified the "stack"

formation or order in which SWAT team members would position themselves

outside the front door, who would breach the door, who would carry a shield,

and who would go upstairs or downstairs upon entry.  *Id.* at 85:14-18, 158:5-

159:15 & Ex. 5.  In addition, Guerra attended an operational briefing on October

17, 2017, which included presentations on (including photographs of) Riley and

3741 Landau.  *Id.* at 96:23-97:6, 163:11-20; Thompson Dep., at 63:13-64:7.

### E.    Guerra's Attempted Drive-By of 3741 Landau on the Morning of the Warrant Executions

On October 18, 2017, shortly after 3:30 a.m., Guerra attempted to conduct a

second drive-by of 3741 Landau with FBI Special Agent Michael Lemoine to

determine whether there might be any new conditions (*e.g.*, vehicles in front or

lights indicating someone was awake) that could impact the tactical operation.

Guerra Dep., at 94:6-96:12; Lemoine Dep., at 40:19-42:2.  Like other agents,

Guerra often used a GPS device for navigation purposes; and, in this instance,

Guerra used a Garmin GPS to navigate to 3741 Landau.  Guerra Dep., at 100:2-

101:6; Lemoine Dep., at 48:4-20; Donovan Dep., at 29:3-30:11.

At the time of this second drive-by, it was dark outside, and Guerra had

dimmed his vehicle's headlights to avoid tipping off Riley.  Guerra Dep., at

106:18-107:12.  When Guerra's GPS unit alerted that they had arrived at 3741 Landau, Guerra observed what he believed to be the same house he had seen during his previous site survey and in the photographs.  *Id.* at 105:9-110:6.  The home was beige and split-level, was located on a corner lot, had a tight stairway and stoop leading to the front door with windows on either side, had a driveway/garage on a separate street that ran perpendicular to the front door, and had was a large tree in the front corner of the property.  *Id.* at 108:1-110:6; *see also* Plf. Martin's Responses to Defs.' First Requests for Admission (**Ex. J**), Nos. 1-20.  Guerra and Lemoine also observed a black Camaro in the driveway, which they later would use as a reference point when locating the home.  Guerra Dep., at 236:15-237:7; Lemoine Dep., at 66:11-24.

Unbeknownst to Guerra and Lemoine, and despite the GPS unit indicating that they had arrived at 3741 Landau and the presence of all of the markers Guerra previously had noted, the home was Plaintiffs' home at 3756 Denville, which faces Landau Lane, is only three or four houses (approximately 400 feet) from 3741 Landau, and does not have its address in front of or anywhere on the house.  Guerra Dep., at 105:15-22, 109:20-110:9; Lemoine Dep., at 30:25-31:13; Martin Dep., at 49:1-50:15, 95:24-96:12, & Exs. 1 & 7.  In fact, the address for 3756 Denville only appeared on the mailbox, which was not on Landau Lane and,

instead, was at the end of the driveway on Denville Trace.  Martin Dep., at 49:11-50:25 & Ex. 1.  As a result, as shown in a photograph taken by Plaintiffs, even in the daytime, the mailbox may not be visible when viewing the home from the front (on Landau Lane).  *Id.* at 49:1-51:9 & Ex. 1.

     **F.**     **The Pre-Execution Briefing, and the Attempted Warrant Execution**

Following their drive-by, Guerra and Lemoine returned to the staging area where the agents and other personnel participating in the warrant executions were shown photographs of Riley and 3741 Landau and were briefed on the case, the tactical plan, Riley and 3741 Landau, and the black Camaro.  Guerra Dep., at 110:22-112:23, 116:12-117:22, 207:19-23, 237:4-7; Thompson Dep, at 66:21-67:12, 71:22-74:1; *see also* Deposition of Timothy Burke ("Burke Dep.") (**Ex. K**), at 28:7-30:10; Deposition of Douglas Dye ("Dye Dep.") (**Ex. L**), at 45:11-46:15, 48:16-50:10; Deposition of Tim Fehmel (**Ex. M**), at 9:19-10:21, 42:19-45:2.

Shortly before 5:00 a.m., the agents left the staging area for 3741 Landau in a caravan of vehicles, which included Atlanta Police Department ("APD") officers.  Guerra Dep., at 128:17-129:3, 149:9-23; *see also* Crum Decl. ¶ 4(f) & Ex. 6. It was still dark outside.  Guerra Dep., at 206:7-12; *see also* Declaration of Ben C. McGee, III ("McGee Decl.") (**Ex. N**) ¶¶ 2-4 & Ex. 1(a)-(b).  When Guerra identified what he believed to be 3741 Landau based on the black Camaro, his

prior preparation, and the morning drive-by, he directed the driver of his vehicle to stop in front of the house—on Landau Lane—and the other vehicles followed suit.  Guerra Dep., at 236:24-237:22 & Ex. 3 ¶ 45; Dye Dep., at 44:15-46:1

SWAT team members and perimeter personnel quickly exited their vehicles and went to their assigned locations while focusing on the structure and any danger areas such as windows and exit points.  Guerra Dep., at 130:23-131:13; Thompson Dep., at 66:22-68:13, 92:10-21; Burke Dep., at 46:17-47:10. Neither Guerra nor Thompson, who had conducted more than two hours of surveillance at 3741 Landau two weeks earlier, nor any of the other agents and officers realized they were not at 3741 Landau.  *E.g.*, Guerra Dep., at 140:5-15; Thompson Dep., at 66:22-68:13, 92:10-21; Deposition of Michael Pettry ("Pettry Dep.") (**Ex. O**), at 69:20-71:4 & Ex. 24.  Once the team was in position, Guerra loudly knocked and announced the presence of law enforcement and, after waiting and receiving no response, directed the door be breached.  Guerra Dep., at 133:23-136:11; *see also* Martin Dep., at 59:12-61:25; Cliatt Dep., at 121:14-17.  An agent breached the door, and another agent deployed a diversionary device (or "flash bang") inside the front door.  Guerra Dep., at 136:12-137:13.  The agents then entered the home at or about 5:00 a.m.  McGee Decl., Exs. 1(a) & (b); Guerra Dep., at 131:16-132:1; Cliatt Dep., at 99:13-103:4 & Ex. 6; Martin Dep., at 62:2-19.

After the agents entered the home, Cliatt and Martin went into their bedroom closet, where Cliatt kept a shotgun.  Cliatt Dep., at 121:18-23; Martin Dep. 51:16-54:14.[3]  Within a minute, one or more agents (but not Guerra) located Cliatt and Martin in the closet and pulled Cliatt out of the closet, dragged him to the bedroom floor, and handcuffed him.  Cliatt Dep., at 92:19-95:13, 127:1-130:1; Martin Dep., at 72:8-13; Guerra Dep., at 137:14-139:9.  No agent ever touched or handcuffed Martin.  Martin Dep., at 71:12-14, 90:2-4.[4]

When Guerra entered the bedroom, Cliatt already had been detained.  Guerra Dep., at 137:14-139:9.  Guerra observed that Cliatt did not have the same tattoos he had seen in the photographs of Riley and asked Cliatt for his name and address, which Cliatt provided.  *Id.* at 140:5-18; Cliatt Dep., at 93:14-22.  At or about that time, Lemoine saw mail that showed a different address than 3741 Landau and brought it to Guerra.  Lemoine Dep., at 32:8-17, 33:21-34:6.  As soon as Guerra realized they were not at the correct home, he "immediately started

---

[3] According to one agent, Cliatt announced there was a shotgun in the closet before the closet was opened.  Burke Dep., at 15:21-16:25.  According to Cliatt, he advised the agents of the shotgun, but not until he was out of the closet and already detained.  Cliatt Dep., at 121:24-126:18.

[4] According to Cliatt, "it appeared [the agents] had no interest in [Martin].  I was their primary target, so they went after me and pulled me out first."  Cliatt Dep., at 128:23-129:2.

spinning everything down."  *Id.* at 33:21-34:6; *see* Guerra Dep., at 140:5-15; Burke

Dep., at 14:8-20; Martin Dep., at 53:9-54:8; Cliatt Dep., at 93:14-95:13.  Cliatt was

lifted up and uncuffed, Guerra advised Plaintiffs that he would come back to

explain what happened, and the agents immediately left the home.  Cliatt Dep.,

at 91:19-95:13, 132:6-133:16; Martin Dep., at 53:2-54:14, 77:14-23.

 As the agents' geolocation data and the APD body-worn camera footage

show, the agents were inside Plaintiffs' home for five minutes or less.  Crum

Decl. ¶ 4(f) & Ex. 6; McGee Decl. ¶¶ 2-4 & Exs. 1(a) & (b).  Other than a sore knee

for which Cliatt did not seek treatment and recovered, Plaintiffs do not claim any

physical injury.  Cliatt Dep., at 150:5-19; Martin Dep., at 71:12-14.

 At or about 5:07 a.m., the agents made entry at 3741 Landau, where Riley

was arrested after attempting to flee.  Crum Decl., Ex. 6; McGee Decl. ¶¶ 2-4 &

Ex. 1(c), (d), & (e); Thompson Dep., at 66:22-68:13; Burke Dep., at 23:17-25:16.

 Once Riley and 3741 Landau were secured, Guerra returned to Plaintiffs'

home where he apologized to Plaintiffs, provided his business card and the name

of an FBI contact, and documented the damage caused by the entry.  Guerra

Dep., at 152:17-20, 203:22-204:13; Cliatt Dep., at 95:4-8, 146:16-147:22; Martin

Dep., at 54:9-14, 99:17-100:1.  Cliatt testified that Guerra was "kind" and "felt that

he was apologetic."  *Id.* at 147:18-22; *see also* Martin Dep., at 54:19-14, 99:17-100:1.

### G.     Neither Guerra Nor the Other Agents Violated Any FBI Policy.

There is no evidence that Guerra or any other agent violated any FBI policy with respect to the planning of or execution of the warrants.  *See* Pettry Dep., at 32:11-38:11, 50:19-51:20, 64:12-65:5; Guerra Dep., at 25:1-26:13, 48:5-51:23, 100:18-101:1, 203:20-21; Donovan Dep., at 27:3-28:6, 57:11-18; Lemoine Dep., at 9:12-10:18, 48:4-24.  For example, no FBI policy or standard operating procedure sets forth how to locate or navigate to a target, whether to use a GPS device or what type of GPS device must be used, whether to conduct or how to conduct a site survey or drive-by of a target location, or how long to wait before entering after knocking and announcing.  *Id.*  Rather, these decisions are discretionary, based on the facts and circumstances of each case.  *Id.*

### H.     Plaintiffs' Lawsuits

Plaintiffs' complaints are virtually identical and purport to assert a Fourth Amendment *Bivens* claim against Guerra for illegal entry, detention, and false arrest (Count VI).  *Martin*, Doc. 1 ¶¶ 80-93; *Cliatt*, Doc. 1 ¶¶ 80-92.  In addition, they purport to assert the following FTCA claims against the United States:

|          | *Martin*                       | *Cliatt*                       |
|----------|--------------------------------|--------------------------------|
| Count I  | False Arrest/False Imprisonment | False Arrest/False Imprisonment |
| Count II | Assault and Battery            | Assault and Battery            |

| Count III | Trespass | Trespass and Interference with Private Property |
| Count IV | Negligent Infliction of Emotional Distress | Intentional and/or Negligent Infliction of Emotional Distress |
| Count V | Negligence | Negligence |

*Martin*, Doc. 1 ¶¶ 43-79; *Cliatt*, Doc. 1 ¶¶ 47-79.

## III.    ARGUMENT AND CITATIONS TO AUTHORITY

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the moving party has the initial burden to show that there "is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party makes this showing, the burden shifts to the non-moving party to "go beyond the pleadings" and present competent evidence, designating "specific facts showing there is a genuine issue for trial." *Id.* at 324.

### A.    Guerra Is Entitled to Summary Judgment (Count VI).

#### 1.    Qualified Immunity Generally

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would

have known.'" *Wood v. Kesler*, 323 F.3d 872, 877 (11th Cir. 2003) (quoting, *inter alia*, *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The purpose of this immunity is to allow government officials to carry out discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Id.* (citation omitted). In other words, "[q]ualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted).

To establish qualified immunity, a government official must show that "he was acting within the scope of his discretionary authority when then wrongful acts occurred." *Wood*, 323 F.3d at 877. Here, Guerra was acting within the scope of his discretionary authority at all relevant times. *See Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995). Consequently, the burden shifts to Plaintiffs to demonstrate that Guerra is not entitled to qualified immunity by showing that (1) he violated a constitutional right, and (2) the right was "clearly established" at the time of the incident at issue. *Pearson*, 555 U.S. at 236, 245. Courts "may

consider these two prongs in either order, and a public official is entitled to qualified immunity if the plaintiff fails to establish either one." *Jacoby v. Baldwin County*, 835 F.3d 1338, 1344 (11th Cir. 2016) (citation omitted).

As discussed below, the Eleventh Circuit has twice recently resolved the issue of qualified immunity in this type of case exclusively under the second prong—whether the right was "clearly established" at the time of the incident at issue. *See Norris v. Hicks*, 855 F. App'x 515, 2021 WL 1783114, at *5-*8 (11th Cir. May 5, 2021); *White v. Mclain*, 648 F. App'x at 838, 841-42 (11th Cir. 2016). As a result, Guerra will proceed directly to that prong.

### 2.    Guerra Did Not Violate "Clearly Established" Law.

"An official's conduct violates clearly established law when 'the contours of [the] right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Echols v. Lawton*, 913 F.3d 1313, 1324 (11th Cir. 2019) (quoting *al-Kidd*, 563 U.S. at 741). To satisfy this standard, a plaintiff must point to (1) a "materially similar case [that] has already been decided," (2) "a broader, clearly established principle that should control the novel facts of the situation," or (3) conduct that "so obviously violate[s] the [C]onstitution that prior case law is unnecessary." *Id.* (citation omitted). Because "the Supreme Court has warned [courts] not to 'define clearly established law at

a high level of generality,'" however, "the second and third paths are rarely-trod

ones." *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021) (citations omitted).

But regardless, "[i]n all of these circumstances, qualified immunity will be

denied only if the preexisting law by case law or otherwise 'make[s] it obvious

that the defendant's acts violated the plaintiff's rights in the specific set of

circumstances at issue.'" *Gates v. Khokhar*, 884 F.3d 1290, 1297 (11th Cir. 2018)

(citation omitted).  To determine that a right is clearly established, courts may

"look only to binding precedent at the time of the challenged conduct—that is,

'the decisions of the Supreme Court, the Eleventh Circuit, or the highest court of

the state.'" *Echols*, 913 F.3d at 1324 (citation omitted).  At the same time, "non-

binding persuasive authority can be used to indicate that a particular

constitutional right is ***not*** clearly established." *Corbitt v. Vickers*, 929 F.3d 1304,

1319 n.14 (11th Cir. 2019) (citation omitted) (emphasis added).

At issue here is the Fourth Amendment, which provides "[t]he right of the

people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures."  U.S. Const., amend. IV.  "As the text

indicates and [the Supreme Court has] repeatedly affirmed, 'the ultimate

touchstone of the Fourth Amendment is 'reasonableness.'" *Heien v. North*

*Carolina*, 574 U.S. 54, 60 (2014) (citation omitted).  "To be reasonable is not to be

perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'"  *Id.* at 60-61 (citation omitted).  Consequently, where a government official mistakenly attempts to execute a valid warrant at the wrong address, there is no Fourth Amendment violation as long as the official's conduct "was consistent with a reasonable effort to ascertain and identify the place intended to be searched."  *Maryland v. Garrison*, 480 U.S. 79, 88 (1987); *Norris*, 2021 WL 1783114, at *5-*8; *White*, 648 F. App'x at 841-42; *cf. Hartsfield*, 50 F.3d at 954-56.

In their Complaints, Plaintiffs point to *Hartsfield*, in which the Eleventh Circuit denied qualified immunity to a deputy sheriff who erroneously led officers to the wrong house—5128 Middlebrooks Drive instead of 5108 Middlebrooks Drive—while attempting to execute a search warrant.  *See* 50 F.3d at 955; Martin, Doc. 1 ¶ 91; *Cliatt*, Doc. 1 ¶ 90.  But there, "the entry occurred during daylight hours and [] the house numbers were clearly marked."  *Hartsfield*, 50 F.3d at 952.  Furthermore, while the target residence "was a corner house on a dead-end street" and "had junk cars and the like strewn outside," the plaintiff's house "was further down the block" and "had a fence around it."  *Id.* And the only action the deputy took prior to the warrant execution was going to

the residence with a confidential informant the day before and "wait[ing] outside in his vehicle" while the informant entered the home and purchased drugs. *Id.* In denying qualified immunity, the Eleventh Circuit explicitly rested its holding on the fact that the deputy "***did nothing***" and "***had done nothing***" to make sure that he was leading officers to the correct residence. *Id.* at 955 (emphasis added).

Over two decades later, in *White*, the Eleventh Circuit emphasized the limited proposition for which *Hartsfield* stands and granted qualified immunity to a deputy sheriff who also led officers to the wrong address—1819 Toulmin Avenue instead of 1817 Toulmin Avenue—when executing a search warrant. 648 F. App'x at 841-43. The *White* deputy mistakenly identified 1819 Toulmin Avenue as 1817 Toulmin Avenue during his drive-by of the target the day before the warrant execution, even though the numerical street address of 1819 Toulmin Avenue "[was] posted at eye level to the left of [the] front door." *Id.* at 840. Believing he was at the correct home, the deputy took a photo and noted the characteristics of that home, which he then used to brief the other officers on the morning of the warrant execution. *Id.* at 840. When the deputy and other officers later arrived at 1819 Toulmin Avenue, they did not observe the house number next to the front door and proceeded to breach the door. *Id.* After entry,

and before realizing their mistake, one of the officers detained the plaintiff,

handcuffed him, and pushed him to the floor.  *Id.* at 840-41.

Although the district court denied qualified immunity to the deputy based

on *Hartsfield,* the Eleventh Circuit reversed, explaining:

> None of our precedents holds—or logically compels the
> conclusion—that an officer's well-intentioned attempts to ascertain
> and identify the property described in a warrant are not reasonable
> simply because they lead to an error, or because more accurate
> means of ascertaining the property's identity were available.

*Id.* at 841.  According to the *White* court, "[t]he *Hartsfield* Court, after all,

repeatedly noted and expressly rested its holding on the fact that '[the defendant

there] did nothing."  *Id.* at 842-43; *see also id.* at 842 ("In *Hartsfield*, 'Newton did

*nothing* . . .'") (emphasis added in *White*).  Instead of doing "nothing," the *White*

deputy revisited the block on which the house was located, took a photo of what

he believed to be the house, and verified that a car associated with the criminal

activity appeared to be parked behind the house he had identified.  *Id.* at 842.

While "[h]is attempts were ineffectual, . . . he made them."  *Id.*  The court, thus,

held the deputy was entitled to qualified immunity.  *Id.* at 843; *see also Rodriguez

v. Farrell*, 280 F.3d 1341, 1345-51 & n.15 (11th Cir. 2002) ("The question is not

whether the police could have done more; but whether they did just enough.").

Most recently, in *Norris*, the Eleventh Circuit again emphasized *Hartsfield*'s limited application when it affirmed the grant of qualified immunity to a sheriff's captain who was part of a warrant execution team that erroneously executed a no-knock search warrant at the wrong house.  2021 WL 1783114, at *1.  There, the warrant was for 305 English Road, which was the home of a known, violent drug dealer.  *Id.*  Based on prior surveillance, the officers believed the home was an active residence, with off-white siding, a black roof, and a black mailbox on a wooden post displaying the address and the drug dealer's surname.  *Id.* at *2.

Although the officers initially arrived at the correct location, they mistakenly concluded that the house was not the correct location because it appeared to be abandoned and dilapidated.  *Id.* at *3.  Rather than regroup or reevaluate, the officers immediately proceeded to the next house (303 English Road), which was yellow and approximately 40 yards away.  *Id.*  There, the officers deployed two flash grenades, forcibly entered the home, and apprehended the plaintiff before realizing their error.  *Id.*

In affirming the grant of qualified immunity, the Eleventh Circuit emphasized that *Hartsfield* merely stands for the proposition that "an officer who '[does] *nothing* to make sure that he was leading the other officers to the correct residence' to execute a search warrant" violates the Fourth Amendment.  *Id.* at *6

(emphasis added in *Norris*) (quoting *Hartsfield*, 50 F.3d at 955).  The *Norris* court

explained that, in contrast to doing nothing, the captain and the other officers

"carefully planned a high-risk raid at what was thought to be a dangerous target

house."  *Id.* at *8.  Additionally, the possibility of guns, violence, and lookouts

also distinguished *Norris* from *Hartsfield*.  *Id.* at *7.  The Eleventh Circuit thus

held that the plaintiff had not shown a violation of "clearly established" law and

the captain was entitled to qualified immunity.  *Id.* at *8-*9.

Here, Guerra did as least as much as (if not more than) the deputy in

*White*, in the same type of high-risk environment as in *Norris*, and his mistake

was more reasonable because, among other things, it was dark, and Plaintiffs'

address was not posted anywhere on the house, much less next to the front door.

Far from doing *nothing*, the undisputed evidence shows that Guerra carefully

planned a high-risk SWAT entry at what was thought to be a dangerous target

house.  In addition to reviewing the materials (including photographs) prepared

by his colleagues and attending an operation-wide briefing, Guerra conducted a

daylight drive-by of 3741 Landau, took his own photos of the residence, and

identified specific features that would be helpful to make entry and identify the

property later.  He also attempted a second drive-by of 3741 Landau assisted by a

GPS navigation device on the morning of the warrant executions to determine

any new conditions that could impact the operation, and confirmed the presence

of those specific markers seen on his initial daytime drive-by of 3741 Landau.

That none of the other agents, including Thompson who had personally

conducted surveillance of 3741 Landau for more than two hours only two weeks

earlier, realized they were not at the correct home alone demonstrates the

reasonableness of the mistake.  Plaintiffs thus cannot show that Guerra violated

"clearly established" law, and Guerra therefore is entitled to summary judgment.

## B.   The United States Is Entitled to Summary Judgment (Counts I-V).

### 1.   This Court Lacks Subject Matter Jurisdiction Over Counts III-V Under the FTCA's Discretionary Function Exception.

A plaintiff cannot sue the United States unless sovereign immunity

unequivocally has been waived.  *Foster Logging, Inc. v. United States*, 973 F.3d

1152, 1157 (11th Cir. 2020).   Where sovereign immunity applies, district courts

lack subject matter jurisdiction.  *Id.* at 1157 n.3.  While the FTCA generally waives

the United States' sovereign immunity for injuries caused by the acts of its

employees, the FTCA contains exceptions, which "must be strictly construed in

favor of the United States."  *Id.* at 1157 & n.4 (citation omitted).  One exception is

the "discretionary function" exception in 28 U.S.C. § 2680(a).  *Id.* at 1157.

Under the discretionary function exception, the United States preserves its

sovereign immunity for any claim "based upon the exercise or performance or

the failure to perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Its purpose is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (citation omitted).

The Supreme Court has developed a two-part test that courts must apply in determining whether challenged conduct falls within the discretionary-function exception. *Foster Logging*, 973 F.3d at 1157 (citing *Gaubert*, 499 U.S. at 322). First, a court must examine the nature of the conduct to determine whether it is "discretionary in nature," meaning that it involves "an element of judgment or choice." *Id.* (quoting *Gaubert*, 499 U.S. at 322). Second, a court must determine "whether the judgment is of the kind that the discretionary function exception was designed to shield." *Id.* (quoting *Gaubert*, 499 U.S. at 322-23).

Here, as discussed below, Plaintiffs' claims for trespass/interference with property, intentional and negligent infliction of emotional distress, and negligence are subject to the discretionary function exception because they arise

from the agents' failure properly to identify and locate the target address. *See Martin*, Doc. 1, at 1 & ¶¶ 57-79; *Cliatt*, Doc. 1, at 1 & ¶¶ 59-79.[5]

### a. The Challenged Conduct Was Discretionary in Nature.

To determine whether the challenged conduct was discretionary in nature, the relevant inquiry is whether a controlling statute or regulation mandated that the government agent perform his or her function in a specific manner. *Foster Logging*, 973 F.3d at 1158. If a federal statute, regulation, or policy specifically prescribed a course of action for the employee to follow, no judgment or choice was involved, and the discretionary function exception does not apply. *Id.* at 1157. "Conversely, unless a 'federal statute, regulation, or policy specifically prescribes a course of action embodying a fixed or readily ascertainable standard,' it will be presumed that the particular act involved an element of judgment or choice," and the discretionary function exception will apply. *Zelaya v. United States*, 781 F.3d 1315, 1330 (11th Cir. 2015) (citation omitted).

---

[5] Although Plaintiffs' claims for false arrest/false imprisonment and assault and battery (Counts I & II) arise from the same conduct, the Eleventh Circuit has held that those types of claims – which are contained in the FTCA's "law enforcement proviso" – are not subject to the discretionary function exception. *See Nguyen v. United States*, 556 F.3d 1244, 1260 (11th Cir. 2009).

Here, no federal statute, regulation, or policy specifically prescribed a course of action that the agents were required to follow in locating the target. *See* Part II.G, *supra*; *also Mesa v. United States*, 123 F.3d at 1438 n.4; *Vivas v. United States*, No. 1:20-CV-02217-WMR, 2021 WL 2582300, at *4 (N.D. Ga. Apr. 21, 2021). Thus, "there was at least some element of judgment or choice at play," and the first prong of the discretionary function exception test is satisfied. *See Foster Logging*, 973 F.3d at 1158; *Zelaya*, 781 F.3d at 1330.

### b. The Judgment or Choice Was of the Kind that the Discretionary Function Exception Was Designed to Shield.

To determine whether the judgment or choice involved was of the kind the exception was designed to shield, "the issue is whether 'the nature of the actions taken' by [the government employees] were 'susceptible to policy analysis.'" *Foster Logging*, 973 F.3d at 1158 (quoting *Gaubert*, 499 U.S. at 325). "This inquiry is not concerned with 'the subjective intent of the government employee' or whether he or she 'actually weighed social, economic, and political policy considerations before acting.'" *Id.* at 1158 (citation omitted). Instead, it requires courts "to look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one that we would expect inherently to be grounded in considerations of policy." *Id.* at 1159 (citation omitted).

In *Mesa*, plaintiffs asserted FTCA claims after DEA agents inadvertently executed an arrest warrant on the wrong person.  123 F.3d at 1437.  The plaintiffs alleged that the DEA agents failed to ascertain the identity of the persons inside the plaintiffs' residence prior to serving the warrant, served the warrant on the wrong man and/or at the wrong address, and failed to cease the detention and questioning of the plaintiffs once their mistake was discovered.  *Id.*  In analyzing the applicability of the discretionary function exception, the Eleventh Circuit identified two types of conduct at issue:  (a) "[t]he decision as to how to locate and identify the subject of an arrest warrant prior to service of the warrant"; and (b) "th[e] process of determining whether the person apprehended is actually the person named in the arrest warrant."  *Id.* at 1438-39.  After "readily" concluding that both types of conduct are discretionary in nature, the court examined the conduct under the second prong.  *Id.*

First, the *Mesa* court concluded that "[t]he decision as to how to locate and identify the subject of an arrest warrant prior to service of a warrant is susceptible to policy analysis."  *Id.* at 1438.  The court explained:

> For example, in deciding how extensively to investigate the location and identity of the subject, agents may weigh the urgency of apprehending the subject in light of such factors as the potential threat the subject poses to public safety and the likelihood that the subject may destroy evidence.  A desire to keep the investigation

> secret—for tactical reasons, to protect confidential sources, to protect
> the agents involved, or for other reasons—may also factor into the
> decision as to how to locate and identify the subject of a warrant.  In
> addition, agents may consider their available resources and decide
> how to allocate those resources among the many investigations for
> which they are responsible.

*Id.* at 1438.  Second, the *Mesa* court concluded that "[t]he process of determining

whether the person apprehended is actually the person named in the arrest

warrant is grounded in considerations of public policy," explaining:

> For example, in making such a determination, the agents may
> consider the possible repercussions of erroneously deciding that the
> person they apprehended is not in fact the person named in the
> warrant and letting that person go free.  Such an erroneous decision
> could potentially create a serious danger to public safety, and could
> also pose a threat to the agents involved in executing the warrant if
> the freed subjected decided to retaliate against the agents.
> Additionally, the agents involved in executing the warrant may
> consider the fact that if they mistakenly free the person detained, the
> person may destroy evidence or may flee and thus evade or make
> more difficult future capture and prosecution.

*Id.* at 1438-39.  The *Mesa* court thus held that the discretionary function exception

applied to the plaintiffs' claims and affirmed the dismissal of the plaintiffs' FTCA

complaint for lack of subject matter jurisdiction.  *Id.*

Earlier this year, in *Vivas*, this court followed *Mesa* in dismissing trespass,

invasion of privacy, infliction of emotional distress, and negligence claims under

- 29 -

the exception where federal officers mistakenly executed search and arrest

warrants at the wrong apartment.  *Vivas*, 2021 WL 2582300, at *4.[6]

Here, the execution of the warrants at Plaintiffs' home is no different than

the warrant executions in *Mesa*, *Vivas*, and *Figueroa*.  As a result, the discretionary

function exception applies to Plaintiffs' claims for trespass/interference with

private property, intentional and negligent infliction of emotional distress, and

negligence.  Because the discretionary function exception applies, this Court

lacks jurisdiction, and the United States is entitled to summary judgment.

> **2.    Plaintiffs' Remaining Claims (Counts I & II) Fail to State a Claim Against the United States under Georgia Law.**

Even where an exception to the FTCA's waiver of sovereign immunity

does not apply, the United States still only may be held liable under the FTCA

"under circumstances where the United States, if a private person, would be

---

[6] The *Vivas* Court also relied on *Figueroa v. U.S.*, No. 13-1290 (CVR), 2014 WL 6879316, at *1, *8-*9 (D.P.R. Dec. 4, 2014), which similarly held that the exception barred FTCA claims arising from FBI agents' attempt to serve a warrant at the "wrong house."  *See id.* at *3.  The *Figueroa* agents deployed tear gas into plaintiffs' home, entered with weapons drawn, handcuffed one plaintiff, and destroyed plaintiffs' belongings before realizing their error.  *Id.* at *8-*9.

Although the *Vivas* court left open the possibility that unconstitutional conduct could overcome the discretionary function exception, the Eleventh Circuit later held the exception applies *even to unconstitutional conduct*.  *Compare* 2021 WL 2021 WL 2582300, at *4, *with Shivers v. United States*, 1 F.4th 924, 931-35 (11th Cir. 2021).

liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. §§ 1346(b), 2674.  The phrase "law of the place" means the law of the State where the alleged tort occurred.  *FDIC v. Meyer*, 510 US. 471, 478 (1994).  Accordingly, Georgia law applies to Plaintiffs' claims.

### a.  False Arrest/False Imprisonment (Count I)

False arrest and false imprisonment are distinct torts under Georgia law. O.C.G.A. §§ 51-7-1, 51-7-20.  The "key distinction" between the two claims "is whether the person was detained using a warrant or not."  *Ferrell v. Mikula*, 295 Ga. App. 326, 329 (2008).  Here, Plaintiffs were not detained using a warrant because the Riley and 3741 Landau warrants – while otherwise valid – were "void" as to them.  *See Reese v. Clayton County*, 185 Ga. App. 207, 207-08 (1987); *Wilson v. Bonner*, 166 Ga. App. 9, 10-11 (1983).  Accordingly, Plaintiffs' purported claim must be for false imprisonment rather than false arrest.  *See id.*

Under Georgia law, false imprisonment is "the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty."  O.C.G.A. § 51-7-20.  "False imprisonment is an intentional tort, not a tort of negligence."  *Miller v. Grand Union Co.*, 250 Ga. App. 751, 754 (2001) (citation omitted).  The only elements are the "detention and the unlawfulness thereof."  *Id.*  Where, as here, the detention is pursuant to void process, whether

the detention is unlawful depends upon whether it was "legally authorized under the circumstances." *Williams v. Smith*, 179 Ga. App. 712, 714 (1986).

Relevant here, "good faith" is a defense to a claim of false imprisonment when a private person makes or procures the detention of another by mistake. *Wilson*, 166 Ga. App. at 14-15; *Stewart v. Williams*, 243 Ga. 580, 583 (1979); *Blocker v. Clark*, 126 Ga. 484, 484 (1906). This is consistent with the general tort provision of O.C.G.A. § 51-7-21, which provides that those who secure or execute a warrant in "good faith" may not be held liable for false imprisonment even if the warrant is defective or void. "Good faith" is "a state of mind indicating honesty and lawfulness of purpose; belief that one's conduct is not unconscionable or that known circumstances do not require further investigation." *Anderson v. Little & Davenport Funeral Home, Inc.*, 242 Ga. 751, 753 (1978).

In *Blocker*, the Georgia Supreme Court acknowledged that protecting one who "acts in good faith, although the wrong person may be arrested," will result in cases "where a person who is innocent will be deprived of his liberty, and will have no redress for the wrong." 126 Ga. at 484. Nevertheless, the court held that this "good faith" standard was necessary so as not to impede the administration of law through the execution of warrants or to allow criminals to escape due to timidity or caution. *Id.* While the issue of good faith often is a question of fact,

- 32 -

summary judgment is appropriate where there is no evidence that the defendant acted in bad faith.  *See*, *e.g.*, *Purcell v. Breese*, 250 Ga. App. 472, 476 (2001).

Here, there is no evidence that any agent acted in bad faith when attempting to execute the warrants at Plaintiffs' home.  Upon realizing their mistake, moreover, the agents immediately left the home, with Guerra returning afterwards to apologize, to provide his business card and an FBI contact, and to document the damage.  Because the agents indisputably acted in good faith, their detention of Plaintiffs was legally authorized, and the United States is entitled to summary judgment on Plaintiffs' false arrest/false imprisonment claims.

### b.    Assault and Battery (Count II)

Under Georgia law, the torts of assault and battery are codified in O.C.G.A. § 51-1-13 (battery) and § 51-1-14 (assault).  *Wallace v. Stringer*, 250 Ga. App. 850, 853 (2001); *Newsome v. Cooper-Wiss, Inc.*, 179 Ga. App. 670, 672 (1986).  O.C.G.A. § 51-1-13 provides that "[a] physical injury done to another shall give a right of action to the injured party, whatever may be the intention of the person causing the injury, unless he is justified under some rule of law."  O.C.G.A. § 51-1-14 provides that "[a]ny violent injury or illegal attempt to commit a physical injury a person is a tort for which damages may be recovered."

Georgia law also provides, however, that "[a] person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force." O.C.G.A. § 16-3-21(a).  In addition, Georgia law provides that "a private person performing a lawful citizen's arrest has the right to use that force reasonably necessary to restrain the arrested individual."  *Williams v. United States*, 314 F. App'x 253, 259 (11th Cir. 2009) (citing *Patel v. State of Georgia*, 279 Ga. 750, 754 (2005), and *Smith v. Holeman*, 212 Ga. App. 158, 160 (1994)).

Here, the "force" was not only *de minimis*, but also reasonable given the agents' belief they were at the home of a violent, gun-possessing gang member. *See, e.g.*, *Muehler v. Mena*, 544 U.S. 93, 100 (2005) ("The governmental interests in not only detaining, but using handcuffs, are at their maximum when, as here, a warrant authorizes a search for weapons and a wanted gang member resides on the premises."); *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013) (grabbing suspect who may be armed, forcing him to ground, and applying handcuffs is a "de minimis," reasonable use of force); *Farrell*, 280 F.3d at 1351 (finding reasonable force used in mistakenly arresting compliant individual pursuant to warrant when officer "grabbed plaintiff's arm, twisted it around plaintiff's back,

- 34 -

jerking it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming that [the officer] was hurting him"). The United States thus is entitled to summary judgment as to Plaintiffs' assault and battery claims.[7]

## III.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment in their favor as to each of Plaintiffs' claims.

Respectfully submitted, this 27th day of August, 2021.

> KURT R. ERSKINE
> *Acting United States Attorney*
>
> s/ Aaron J. Ross
> AARON J. ROSS
> *Assistant United States Attorney*
> Georgia Bar No. 461981

---

[7] In addition to being barred under the FTCA's discretionary function exception, *see* Part III.B.2, *supra*, Plaintiffs' Counts III and IV also fail to state a claim under Georgia law. As to Count III, Georgia's "innocent trespasser" doctrine protects from liability "individuals who enter the land of another under the mistaken belief that it is permissible to do so." *Woodstone Townhouses, LLC v. Southern Fiber Worx, LLC*, 855 S.E.2d 719, 728 (2021) (citation omitted). As to Count IV, Georgia's "impact rule" bars Plaintiffs' negligent infliction of emotional distress claim because Plaintiffs did not sustain any physical injuries, and the agents' conduct was not malicious, willful, or wanton. *See Clarke v. Freeman*, 302 Ga. App. 831, 836 (2010). Further, Cliatt's intentional infliction of emotional distress claim fails because he cannot show that the agents engaged in "intentional or reckless conduct . . . that is extreme and outrageous" or that he suffered "severe emotional distress." *Ferrell*, 295 Ga. App. at 333.

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the documents to which this certificate is attached

have been prepared in Book Antiqua font, 13-point type, which is one of the font

and point selections approved by the Court in N.D. Ga. L.R. 5.1(C).

<u>s/ Aaron J. Ross</u>
Aaron J. Ross
*Assistant United States Attorney*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notifications of such filing to the following opposing counsel of record:

Jeffrey R. Filipovits
Spears & Filipovits, LLC
1126 Ponce de Leon Ave.
Atlanta, Georgia 30306

Lisa C. Lambert
Law Office of Lisa C. Lambert
245 N. Highland Ave., Suite 230-139
Atlanta, Georgia 30307

*Counsel for Curtrina Martin, et al.*

Zack Greenamyre
Mitchell & Shapiro LLP
3490 Piedmont Road, Suite 650
Atlanta, Georgia 30305

*Counsel for Hilliard Toi Cliatt*

This 27th day of August, 2021.

s/ Aaron J. Ross
Aaron J. Ross
*Assistant United States Attorney*

*Counsel for Defendants*