THE FOLLOWING IS THE PDF OF AN OFFICIAL TRANSCRIPT.

OFFICIAL TRANSCRIPTS MAY ONLY BE FILED IN CM/ECF BY THE OFFICIAL

COURT REPORTER AND WILL BE RESTRICTED IN CM/ECF FOR A PERIOD OF 90

DAYS.  YOU MAY CITE TO A PORTION OF THE ATTACHED TRANSCRIPT BY THE

DOCKET ENTRY NUMBER, REFERENCING PAGE AND LINE NUMBER, ONLY AFTER

THE COURT REPORTER HAS FILED THE OFFICIAL TRANSCRIPT; HOWEVER, YOU

ARE PROHIBITED FROM ATTACHING A FULL OR PARTIAL TRANSCRIPT TO ANY

DOCUMENT FILED WITH THE COURT.

```
 1                UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3

 4   CURTRINA MARTIN AND G.W.,        )
                                      )
 5        PLAINTIFFS,                 )
                                      ) DOCKET NO. 1:19-CV-04106-JPB
 6        -VS-                        )
                                      )
 7   UNITED STATES OF AMERICA,        )
     ET AL.                           )
 8                                    )
          DEFENDANT.                  )
 9   _____

10   HILLIARD TOI CLIATT,             )
                                      )
11        PLAINTIFF,                  )
                                      )  DOCKET NO:  1:19-CV-04180-JPB
12    -VS-                            )
                                      )
13   UNITED STATES OF AMERICA,        )
     ET AL,                           )
14                                    )
          DEFENDANT.                  )
15

16
               TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS
17               BEFORE THE HONORABLE J.P. BOULEE
                    UNITED STATES DISTRICT JUDGE
18                       APRIL 27, 2022

19

20

21

22   STENOGRAPHICALLY RECORDED BY:

23
                      PENNY PRITTY COUDRIET, RMR, CRR
24                       OFFICIAL COURT REPORTER
                       UNITED STATES DISTRICT COURT
25                          ATLANTA, GEORGIA
```

```
1                    A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFFS CURTRINA MARTIN AND GW:

4         JEFFREY FILIPOVITS, ESQ.
          LISA CATHERINE LAMBERT, ESQ.
5

6

7    ON BEHALF OF THE PLAINTIFF HILLIARD TOI CLIATT:

          ZACK GREENAMYRE, ESQ.
8

9

10   ON BEHALF OF THE DEFENDANTS - UNITED STATES AND LAWRENCE GUERRA:

          AARON JOSHUA ROSS, ESQ.
11        DARCY F. COTY, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **(PROCEEDINGS HELD IN OPEN COURT AT 10:04 A.M., ATLANTA)**

2          COURTROOM DEPUTY CLERK:  The Court has set aside time

3  for oral argument in cases Martin, et al, v. United States of

4  America, et al, Case Number 1:19-CV-4106.  And case Cliatt v.

5  United States of America, et al, Case 1:19-CV-4180.

6          Counsel, please make your appearances for the record.

7          MR. GREENAMYRE:  Zack Greenamyre on behalf of Toi

8  Cliatt.

9          MS. LAMBERT:  Lisa Lambert on behalf of Curtrina Martin

10  and GW.

11          MR. FILIPOVITS:  Jeff Filipovits on behalf of Ms. Martin

12  and GW.

13          MR. ROSS:  Aaron Ross on behalf of defendants.  And I

14  have co-counsel Darcy Coty and FBI Special Agent Lawrence Guerra

15  here as well.

16          THE COURT:  Good to see all of you here.

17          I've set this for a hearing on the defendants' motion

18  for summary judgment.  Before I get to that, I wanted to hear if

19  anyone had any objections to consolidating these two cases.

20          MR. GREENAMYRE:  From plaintiffs' perspective, no.

21  We've already been doing that in large part.  And we wouldn't

22  imagine having two separate trials on this.

23          THE COURT:  All right.  Thank you.

24          MR. ROSS:  Defendants have no objection.

25          THE COURT:  Okay.  The cases are hereby consolidated.

4

```
 1   And let's just do a short docket entry to that effect.  I do that
 2   because I find that these cases involve common cases of law and
 3   facts.
 4           Mr. Ross, assuming you're lead, your motion, and I'll
 5   let you begin.  And I've got about an hour set aside for this, so
 6   just give equal time to each side, okay?
 7           MR. ROSS:  May I approach the podium, your Honor?
 8           THE COURT:  Sure.
 9           MR. ROSS:  May it please the Court.
10           Defendants have moved for a summary judgment as to each
11   of plaintiffs' claims.  As to plaintiffs' Bivens claim against
12   Agent Guerra personally, Agent Guerra is entitled to qualified
13   immunity because plaintiffs cannot meet their burden to show that
14   Agent Guerra committed a constitutional violation and that the
15   violation was clearly established at the time of the incident,
16   which was October 18, 2017.
17           The Fourth Amendment itself allows government officials
18   to make reasonable mistakes.  And these exact circumstances where
19   law enforcement officers have attempted to execute warrants at the
20   wrong home by mistake, the Eleventh Circuit as recently as last
21   year in Norris v. Hicks and a few years earlier in White v. Mclain
22   explained in unambiguous terms that as long as a law enforcement
23   officer does more than nothing to identify and locate the target
24   of a warrant, he does not violate clearly established law.
25           In White the house number of the plaintiff's home was
```

1  posted at eye level next to the front door.  In *Norris* the

2  plaintiff's home was a different color than the target's home and

3  the officers knew in advance that the target home had a mailbox

4  that displayed both the address of the home and the suspect

5  surname.  Nevertheless, in both cases the Eleventh Circuit

6  affirmed the grant of qualified immunity because the officer did

7  more than nothing.

8         In *White* the officer did more than nothing because he

9  attempted to conduct a drive-by of the target home even though his

10  drive-by was ineffectual because it was of the wrong home.  In

11  *Norris* the officer only attended a briefing earlier in the day of

12  the warrant execution.

13        The Eleventh Circuit in *Norris* and *White* contrasted the

14  facts in those cases with the facts in *Hartsfield v. Lemacks,* an

15  Eleventh Circuit decision which plaintiffs rely on here, where

16  the only thing the defendant did there was accompany a

17  confidential informant to the target home where he waited in

18  the car while the confidential informant purchased drugs.

19        The warrant execution in *Hartsfield* occurred in daylight

20  hours, the house numbers were clearly marked, it was not a

21  dangerous or high-risk operation but really a simple drug bust,

22  and the target home was dramatically different than the

23  plaintiff's home.  The target home was located on a corner lot and

24  had junk cars strewn about the front, whereas the plaintiff's home

25  was located further down the street, had a fence around it and no

1  junk cars.

2       Here, unlike in *Hartsfield*, the warrant execution

3  occurred in the dark.  The warrant execution was extremely high

4  risk because of the violent history of the suspect Joseph Riley

5  and likely presence of firearms.  There were no house numbers in

6  front of or on the house.  And plaintiff's home was not dissimilar

7  to the target home.

8       And Agent Guerra did considerably more than nothing.  He

9  reviewed a general operation order and a SWAT addendum to the

10  operation order, which included photographs of the targets, maps

11  and directions.  He conducted his own site survey where he took

12  photographs of the residence, created a tactical plan and chose a

13  staging location.  The day before the warrant executions he

14  attended an operational brief like the officer did in *Norris* that

15  was for team leaders where they discussed each target in this

16  large-scale operation.

17       Like the officer in *White*, he -- on the morning of the

18  warrant execution, he conducted a drive-by of the target in order

19  to determine whether there were any new obstacles.  And then at

20  the staging area right before the warrant execution he briefed the

21  other agents on the targets, including specifically identifying

22  the address and passing photos around of the residence.

23       None of the agents, including Task Force Officer

24  Thompson, who had conducted more than two hours of surveillance

25  at the target home only two weeks prior to the warrant execution,

 1   realized that they were at the wrong home alone demonstrates the

 2   reasonableness of Agent Guerra's conduct.

 3          Because Agent Guerra's conduct was reasonable and at a

 4   minimum did not violate clearly established law, which is the

 5   second prong of the qualified immunity analysis, he is entitled to

 6   qualified immunity.

 7          As the plaintiffs' claims against the United States,

 8   the FTCA, the Federal Tort Claims Act, discretionary function

 9   exception bars plaintiffs' Counts 3 through 5, which are for

10   negligence, infliction of emotional distress and trespass.

11          The discretionary function exception preserves the

12   United States Sovereign immunity for any claim based upon the

13   exercise or performance or the failure to perform a discretionary

14   function or duty of a federal employee, whether or not the

15   discretion involved be abused.  There's a two-part test that

16   courts apply to determine whether the discretionary function

17   exception applied.

18          As Judge Ray held in the *Vivas* case that we cited just

19   last year, which followed the Eleventh Circuit decision in *Mesa v.*

20   *United States*, and also cited the *Figueroa* case that we cited, all

21   of which involved execution of warrants at the wrong home by FBI

22   agents, the discretionary function exception applies in this exact

23   type of scenario because FBI agents have discretion on how to

24   identify and locate the target of a warrant and there are policy

25   reasons why such discretion exists.

1          Because the discretionary function exception applies,

2    the United States has not waived its Sovereign immunity as to

3    Counts 3 through 5 and this Court lacks subject matter

4    jurisdiction over those claims.

5          For Counts 1 and 2, which are the false imprisonment and

6    the assault and battery claims, we have not argued discretionary

7    function exception based on the Eleventh Circuit decision in the

8    *Nguyen* case, and that's N-G-U-Y-E-N case.  But even where an FTA

9    (sic) exception does not apply, the United States still only may

10   be held liable under the FTCA under circumstances where the United

11   States if a private person would be liable to the plaintiff in

12   accordance with the law of the place where the act or omission

13   occurred, which is Georgia law here.

14          Contrary to plaintiffs' brief, it is not proper to say

15   because a private person cannot go into someone's house and detain

16   them, the United States is liable.  First, the FTCA does not allow

17   for strict liability.  And as the Eleventh Circuit explained in

18   the *Denson* case and as other circuit courts have expressly stated,

19   holding otherwise would lead to an absurd result that federal

20   officers acting lawfully still could subject the United States to

21   liability if their conduct does not conform to that which is

22   required of a private citizen.

23          Second, the FTCA itself in Section 2674 makes clear that

24   the type of law that we are concerned with does not have to

25   involve the exact circumstances at issue but rather only like

1   circumstances -- quote, like circumstances.  In *Williams v. United*
2   *States*, for example, the Eleventh Circuit looked to both Georgia
3   Citizens Arrest Law and law enforcement specific cases in granting
4   summary judgment to the United States on the ground that the FBI
5   agent's use of force in that case was reasonable, even though the
6   FBI agent hit the plaintiff with his car while attempting to
7   execute an arrest warrant.
8           Other circuits likewise have applied law enforcement
9   privileges to FTCA claims, explaining that such is not precluded
10  by the Supreme Court's holding in *United States v. Olson*, which
11  only held that the United States cannot invoke state or municipal
12  entity liability, such as, for instance, Georgia's Sovereign
13  immunity with respect to FTCA claims.
14          THE COURT:  You cited the *Williams* case there, right?
15          MR. ROSS:  Yes.
16          THE COURT:  And that's *Williams* v. *Smith*?
17          MR. ROSS:  That's *Williams* v. *United States*, 314 F.
18  App'x 253.  It was a 2009 Eleventh Circuit case.
19          THE COURT:  All right.  Bear with me for a moment.
20          I'm looking at your pages 31 through 33 of your motion.
21  That's your false arrest, false imprisonment section, right?
22          MR. ROSS:  Yes, your Honor.
23          THE COURT:  Okay.
24          MR. ROSS:  Right.  There's several cases that have
25  *"Williams"* in the title.

1          THE COURT:  Right.  I'm just trying to make sure that I
2   follow you.
3          I thought in that last section you cited to *Williams*
4   and -- you mentioned the *Williams* case.  And the only *Williams*
5   case I see here on 31 through 33 is that *Williams v. Smith* and
6   *Stewart v. Williams*, but you're referencing a third *Williams* case.
7   Is that in your brief?
8          MR. ROSS:  It is in our brief.  And it's on page 34 I
9   see it.  And I believe we also discuss it in our reply brief.
10         THE COURT:  Bear with me a moment.
11         MR. ROSS:  And I believe plaintiff also cited.
12         THE COURT:  All right.  Thank you.
13         MR. ROSS:  Yes, your Honor.
14         Turning specifically to the false imprisonment claim,
15  Georgia law provides that where an alleged detention is by virtue
16  of a warrant, even where -- even if the warrant is defective or
17  void, there is no liability for false imprisonment if the warrant
18  was executed in good faith.
19         Good faith we identified in our brief under Georgia law
20  means a state of mind indicating honesty and lawfulness of
21  purpose, belief that one's conduct is not unconscionable.  Here
22  there's no evidence whatsoever that any agent acted in bad faith.
23  Instead the undisputed evidence is that the agents believed they
24  were at the correct home before they entered, they believed they
25  had a lawful right to detain the plaintiffs, and they immediately

1  left plaintiffs' home when they realized their mistake.  As a

2  result, the United States is entitled to summary judgment as to

3  Count 1.

4          With respect to plaintiffs' assault and battery claim,

5  which is Count 2, there's no liability under Georgia law for

6  assault or battery if the alleged use or threat of force is

7  justified under some rule of law.

8          In the *Williams* case, which we had just discussed, is in

9  our brief, the Eleventh Circuit held that the United States was

10 entitled to summary judgment because both a private person and a

11 law enforcement officer have the right to use reasonable force to

12 defend themselves or to restrain an arrested individual.

13         We cited several other binding cases in our brief -- the

14 *Muehler* case comes to mind, *Rodriguez v. Farrell*, and I believe

15 the *Myers v. Bowman* case -- that likewise show that the agent's

16 brief detention of plaintiffs here, including the brief

17 handcuffing of Mr. Cliatt, was reasonable and justifiable under

18 the circumstances not withstanding their mistake, particularly

19 given the high-risk nature of the operation involved, the violent

20 history of Mr. Riley and the likely presence of firearms.

21         THE COURT:  Those cases, are those summary judgment

22 cases?

23         MR. ROSS:  *Rodriguez v. Farrell* reversed the denial of

24 qualified immunity at summary judgment.  I can't recall.  I

25 believe they all are.  I know *Rodriguez v. Farrell* reversed the

```
 1   denial of qualified immunity at summary judgment.  Myers v. Bowman
 2   affirmed summary judgment for the officers.  And I believe that
 3   Muehler was also a summary judgment case where the Supreme Court
 4   found that the officers had acted reasonably in detaining an
 5   occupant in handcuffs for two hours -- two to three hours, I
 6   believe, where here we're just talking a few minutes.
 7             THE COURT:  I'm sorry, the Farrell case?
 8             MR. ROSS:  Rodriguez v. Farrell, 280 F.3d 1341, an
 9   Eleventh Circuit case from 2002.
10             THE COURT:  I'm just looking at the cite to it, of
11   Farrell, at the bottom of page 34, so I don't know the 280 F.3d at
12   1351 (sic).
13             MR. ROSS:  Yes, your Honor.  And I did realize we didn't
14   give a full cite for the Rodriguez v. Farrell case.  My apologies
15   for that.  But it's Rodriguez v. Farrell.
16             THE COURT:  Okay.
17             MR. ROSS:  And then that case, which was a mistaken
18   arrest case that involved an arrest of a person who was 5'11" and
19   180 pounds, even though the warrant was for someone who is 5'6",
20   139 pounds.  And the handcuffing itself caused such injury to the
21   plaintiff that he had to have 25 surgeries and had his arm
22   amputated, nevertheless the Court found that the arrest was
23   reasonable and the handcuffing was reasonable and reversed  the
24   denial of qualified immunity to the officer.
25             As a result, plaintiffs' claim for false -- claim for
```

```
1   assault and battery, which is Count 2, also fails as a matter of
2   law.  And the United States is entitled to summary judgment as to
3   that claim.
4          We, therefore, request that the Court grant summary
5   judgment to Agent Guerra and the United States.  Thank you.
6          THE COURT:  Thank you, counsel.
7          Pronounce your name for me one more time.  Fili- --
8          MR. GREENAMYRE:  Zack Greenamyre.
9          THE COURT:  Okay.
10         MR. GREENAMYRE:  And thank you again, your Honor, for
11  hearing oral argument in this matter.  Again, Zack Greenamyre on
12  behalf of Toi Cliatt.
13         THE COURT:  And we also have Ms. Lambert.  And is it
14  Mr. Filipovits?
15         MR. FILIPOVITS:  Filipovits.
16         THE COURT:  Filipovits, okay.  Great.  Thank you.
17         Go ahead, counsel.
18         MR. GREENAMYRE:  And the proposed division is that I
19  would handle the factual matters, the Fourth Amendment claim,
20  anything having to do with spoliation.  And then Ms. Lambert will
21  take lead on the FTCA aspects.
22         THE COURT:  Okay.
23         MR. GREENAMYRE:  For the Fourth Amendment claim, the
24  clearly established law comes from two sources:
25         First, the Supreme Court's decision in Garrison;
```

1          And, second, the Eleventh Circuit's opinion in

2    *Hartsfield*.

3          Under those two cases, the question is whether the

4    officer engaged in reasonable efforts to ascertain and identify

5    the place to be searched and avoid mistake.  If a jury could find

6    that the officer's efforts were clearly unreasonable, then the

7    Fourth Amendment claim should go forward and qualified immunity

8    would not apply.

9          *Hartsfield* says that you have to check to make sure you

10   are leading officers to the correct house, and that it is improper

11   to fail to look at clearly marked house numbers.  *Hartsfield* also

12   says that going to the house the day before is insufficient to be

13   granted qualified immunity.  In that case the officer went to the

14   house before and was stationed outside for an extended period of

15   time while a confidential informant went, purchased drugs at the

16   target location, came back.  Disputed facts preclude summary

17   judgment on all claims.

18          As set out in our briefing, there are a number of

19   reasonable inferences a jury could draw that would lead to the

20   conclusion that Officer Guerra's efforts to avoid mistake were

21   clearly unreasonable.  And in our brief we kind of highlighted two

22   different paths a jury could go.

23          On the one hand, the jury may largely credit Guerra's

24   recitation of the historical facts and still find that he did not

25   engage in reasonable efforts to avoid error.  And that doing so

1   would amount to doing none of what was reasonable under the

2   circumstances.

3          First, he knew the home from his prior visit.  There's

4   only one way in and out of the subdivision, so he knew the target

5   house was on the left-hand side of the road and plaintiff's house

6   was on the right side.

7          He knew that the houses, you know -- in this case the

8   houses were separated by at least four houses, which is a larger

9   number of houses than in any Eleventh Circuit case, published or

10  unpublished, granting or denying qualified immunity.

11         The target house was at a four-way intersection instead

12  of a three-way intersection like plaintiff's.

13         And as you're going into the house, the target location

14  is at the second intersection, whereas plaintiff's house was at

15  the first intersection.

16         Second, Officer Guerra had a copy of the warrant with

17  the address and photo of the home readily available.  He failed to

18  look at that before going in.  He did not look at the house number

19  that was on the mailbox.  And he also did not delegate that task

20  to anyone else.  And in his deposition testified somewhat

21  misleadingly about the time it would take to make that delegation.

22  If you have 20, 30 officers, support from APD on the scene, it's

23  only going to take a couple seconds to check the mailbox when the

24  house is surrounded.  Officer Guerra testified that it would delay

25  the operation by at least 60 seconds in order to do that.

1          He did not use the target's --

2          THE COURT:  In your mind is 60 seconds not a big deal

3    when you've got however many police officers and agents around a

4    home of a suspect?  I mean, to me I hear 60 seconds and I'm

5    thinking, gosh, that's not a lot of time in the world of lawyers

6    and judges, but in the world of somebody executing a search

7    warrant I would think 60 seconds is a long time.

8          MR. GREENAMYRE:  That was precisely my point.  I don't

9    disagree there.  My disagreement is with Guerra's testimony that

10   it would delay the operation by that long to check the mailbox

11   when the house is surrounded.  I think a reasonable juror could

12   say that it wouldn't delay the operation at all or, at most, by

13   one or two seconds.

14         THE COURT:  It's at night, right?  It's dark out?

15         MR. GREENAMYRE:  Correct.

16         THE COURT:  Am I right this is a driveway that has a

17   couple different ways to get in and out of it, the mailbox is on

18   the other side or something?

19         MR. GREENAMYRE:  Jeff, can you pull it up.

20         So if you look, the house immediately above Cranford

21   Drive, if you see that word on the page, that's the target house.

22   So the driveway is coming off to the right.  And then there's the

23   front door that you can see.  And, you know --

24         THE COURT:  Where's the mailbox?

25         MR. GREENAMYRE:  The mailbox is behind that (indicating)

1  tree, which is where the driveway is at.

2          THE COURT:  So not at the front of the house?

3          MR. GREENAMYRE:  Right.  And there are multiple vehicles

4  pulling up.  There are at least two FBI vans and then there's

5  multiple APD vehicles that are also there.  And the house is

6  immediately surrounded.

7          THE COURT:  If I'm the lead agent executing this and I

8  decide, you know what, I want to check the address, it's not on

9  the front of the house, I need to have somebody check and I need

10 somebody on the other side to check it.  I've got a radio to --

11 I've got to figure out who's the person who is over that way,

12 right?

13         MR. GREENAMYRE:  Correct.

14         THE COURT:  I assume I radio that person?

15         MR. GREENAMYRE:  Right.

16         THE COURT:  They've got to do it and they've got to

17 radio me back, right?

18         MR. GREENAMYRE:  Yep.

19         THE COURT:  So you think you could do all that in two

20 seconds?

21         MR. GREENAMYRE:  I do, you know, with, you know,

22 planning ahead of time, right?  You talk to the person as you're

23 driving in.  You know, when you go around, check the mailbox and

24 then radio me.  This person is going through the driveway and

25 around to the back of the house anyway as part of their duties.

1  And say, correct, we have the right address.  I think a jury could

2  reasonably conclude that.

3        THE COURT:  Two seconds?

4        MR. GREENAMYRE:  Less than 60 seconds for sure.  And I

5  think 2 seconds would not be an unreasonable inference by the

6  jury.

7        A fourth thing that was not done is looking at the

8  target's realtime Geolocation information.

9        Jeff, can you pull that up.

10       This is on the right-hand side of the -- no, it's a full

11  screen.  So this is information that Guerra had available on his

12  cell phone, that other officers had available on their cell phone.

13  So this is something that Guerra could have looked at at any point

14  prior to -- you know, either on the site survey or the -- what's

15  been called the drive-by in the hours beforehand or in the run-up

16  to it or it could have been delegated.  The X marks the spot of

17  plaintiff's home.  And then these pings in blue represent the

18  target's location.

19       An additional -- a fifth thing that was not done that we

20  think should have been done was to note the presence of an unknown

21  vehicle at the target's address and the absence of a known vehicle

22  at the target's home.  So this is part of the preparation

23  materials.  Officers are to expect that there will be a White

24  Nissan Maxima outside the home.  There was, in fact, a White

25  Nissan Maxima outside the home of the target.  And in contrast

 1  there was an unknown vehicle, a Camaro, that was not associated

 2  with the target or anyone else at plaintiff's home.  So another

 3  fact.

 4          So looking -- taking that path, you know, there would be

 5  a number of ways that a reasonable officer would know well that

 6  this was not the right house.  But a jury could come to a

 7  different conclusion by making different reasonable inferences.  A

 8  jury could conclude from Guerra's multiple instances of inaccurate

 9  sworn testimony that his testimony should not be reasonably relied

10  upon.  There's a maximum of --

11          THE COURT:  As far as your list of these other things

12  that might have been done or could have been done, aren't you

13  demanding perfection?  And the law, as I understand it in these

14  cases, doesn't in any way demand perfection of an agent.

15          MR. GREENAMYRE:  Right.  I don't think what we are

16  demanding is perfection by any means.  The law demands reasonable

17  efforts.  And here what we have is readily available information

18  that wholly clears up the situation.  It's exculpatory towards our

19  client's house and it's inculpatory towards the target's house.

20          THE COURT:  But the standard is not that I sit here and

21  Monday morning quarterback to see if they did everything a perfect

22  agent might do, is it?

23          MR. GREENAMYRE:  No, it's not.

24          THE COURT:  And isn't that what you're asking me to do?

25          MR. GREENAMYRE:  No, your Honor.

1              THE COURT:  Well, what do you say about the *Norris* and

2  *White* cases?  Because I understand you point to the *Hartsfield*

3  case.

4              MR. GREENAMYRE:  Correct.

5              THE COURT:  But what do you say about *Norris* and *White*?

6              MR. GREENAMYRE:  We have a number of responses.

7              First, neither of those cases is binding on this Court.

8  And they do not purport to nor could they mark a change in the

9  law.  They're both unpublished.

10             And as Judge Newsom recently reminded litigants in

11  the Eleventh Circuit, unpublished decisions are as valuable as

12  they are persuasive.  That was *McNamara v. GEICO*, decided

13  April 5th.  We have said so again and again but it bears

14  repeating, a district court shouldn't simply cite to one of our

15  unpublished cases as the basis for its decision without separately

16  determining that it's persuasive.

17             So our first argument is that it's not persuasive.  And

18  the reason there is that what those cases did was they took a --

19  the do-nothing language from *Hartsfield*, which was in *Hartsfield* a

20  sufficient condition to deny summary judgment, and then they

21  turned that into a necessary condition for all cases going

22  forward, or for their case, right?  And the do-nothing language

23  from *Hartsfield* is itself somewhat misleading because the officer

24  in that case did do -- he spent time at the house the day right

25  before the warrant was executed and that was -- that was part of

1  the efforts.

2          And I think here -- again, there's some other factual

3  disputes.  In *Norris* we have -- factual differences, I should say.

4  In *Norris* we have -- this is not a normal subdivision.  The house

5  is, you know, deep in a -- sort of a rural area.  And you have one

6  house and then kind of another house in its back yard.  And the

7  first house looks like an outbuilding.  That's not the case here,

8  right?  This is a standardized subdivision.  But still the houses

9  are right next to each other.

10          The same is true of the *White* case where I believe the

11  houses were separated by a single house.  You know, there's only

12  one house in between them.  And even if the standard is do

13  nothing, I think we can meet that standard with the things that we

14  were talking about.

15          And to go back to, you know, addressing your point

16  about, you know, are we holding officers to perfection?  The

17  characteristics -- the actions that we fault Officer Guerra for

18  not taking share a number of critical characteristics.

19          First, they're very fast.  Take negligible time, effort

20  and resources to either look at the mailbox, look at the officers'

21  location, make note of the unknown car.

22          They're wholly exculpatory.  They would clear

23  plaintiff's home as the correct house.

24          And, third, and perhaps most importantly, they're

25  important to do for reasons above and beyond making a mistake.

1  Knowing where the target is and knowing who was in the home is

2  important for officer safety and for successful completion of the

3  execution of the warrant.  There are multiple reasons to do these

4  tasks.

5          So going back briefly to the second set of inferences a

6  jury could make.  We think that a jury could find that Officer

7  Guerra did not go -- do the site survey in the weeks leading up to

8  this and did not do the drive-by of this.  And there is objective

9  evidence in both instances showing that this may not have

10  happened.

11         With regard to the site survey, he swore a declaration

12  at the outset of this case saying that he went with an officer

13  named Donovan.  And then once we finally were able to obtain

14  Officer Donovan's GPS coordinates, it showed that Donovan did not

15  go at the time that Officer Guerra said he went and did not go at

16  all in the run-up to this.

17         There's also -- you know, for that site visit you would

18  expect to have metadata from the photos that Officer Guerra claims

19  that he took, both, you know, from the photo itself that shows

20  what device it was taken, what date it was taken on.  We do not

21  have that.  And we don't have an explanation as to why we don't

22  have that.  All we have is the paper copy of it.  But even

23  producing a paper copy of a photo is going to create additional

24  data.  Officer Guerra testified to get it from either the phone or

25  the camera to be printed, he would e-mail it to himself or someone

1  else to be printed or he would upload it to the server.  There's

2  no records of any of those actions being taken.

3          With regard to the --

4          THE COURT:  So is the insinuation that he went back

5  after all this happened and took that photo?

6          MR. GREENAMYRE:  Or these pictures were taken by someone

7  else and claimed to be taken by him.

8          THE COURT:  Is there any evidence of someone else taking

9  them?  I mean, do you have anybody else who says, Actually, I

10  think it was me who took those?

11          MR. GREENAMYRE:  We don't have evidence of someone

12  saying, Actually, it was me who took those photos.  What we do

13  have is Officer Guerra testifying that he took certain photos that

14  we now know based on the metadata he definitely did not take.  But

15  it's pictures of the same house, right?

16          THE COURT:  But, I mean, for this to -- for that point

17  to matter, wouldn't the argument have to be he never went over

18  there, he never did any prep work, he didn't do anything and

19  instead he's now creating this master lie under which he actually

20  did do something?  Oh, and here's a picture, so he got this

21  picture afterwards, took it afterwards, and now he's saying he

22  actually had it before then.  Is that the argument?

23          MR. GREENAMYRE:  That's part of the argument, right?

24  And --

25          THE COURT:  Isn't that a little fantastical?

1         MR. GREENAMYRE:  I think -- if we're looking at that in

2    isolation, you know, as one, you know, inference and we're asking

3    the jury to jump from that to, you know, falsification, yes.  But

4    we have more than just that one point.  We have a mosaic of other

5    pieces of information that we know are inaccurate.  And we also

6    have an absence of evidence that we should have that, you know,

7    doesn't -- has not been provided to us for -- you know, without

8    explanation, right?

9         So that's sort of one piece of it -- or, I guess, two

10   data points would be the inaccurate declaration with regard to

11   Donovan and the metadata with the photos, right, both the lack of

12   e-mails and lack of metadata for the files themselves.

13        The day of the drive-by, similar thing where Officer

14   Guerra says that he went right before the execution of the

15   warrant.  And to corroborate this, you know, he has Officer

16   Lemoine.  Officer Lemoine, we have his GPS data.  For the time

17   period we -- Officer Lemoine is only at the staging area, which is

18   here (indicating), not at the house down the road.  And Officer

19   Lemoine testified that there would be no reason for him to leave

20   his cell phone at the staging area.  Additionally, we have, you

21   know -- so maybe three data points there.

22        Additional data points that we have, in his deposition

23   testimony we asked him repeatedly in a bunch of different ways,

24   what are all the tools you had to be able to, you know, get to the

25   right location?  Despite asking this a number of different ways,

1  Riley's realtime GPS data location was not disclosed to us.  And

2  we didn't discover it until we got unredacted versions of

3  documents down the line.

4       And, you know, a large part of the blame that gets

5  shouldered for this is the Garmin GPS device.  He says that the

6  Garmin device led him astray and caused this error but does not

7  explain how the Garmin unit led him to the correct house when he

8  was conducting the site survey.  And, of course, as we set out in

9  the portion of the brief about spoliation, the Garmin device was

10 thrown away immediately after this raid.

11      And the import of that device is that the Garmin device

12 is not like Google Maps, it has a static map and you have to

13 upload a new map system, right?  It also has a log of the

14 different locations that you've been to, which would be able to

15 corroborate or disprove.  And if we were to use the Garmin device,

16 we could see whether this error was replicable or not, whether it

17 would happen again if we plugged in the same address and went to

18 the same location.

19      So I think, you know, putting together that mosaic, you

20 know, in addition to the fact that just the -- there's some

21 evidence of never having been to the site before that comes from

22 the fact mistake.  It's not a very strong piece of evidence but it

23 is a further piece of evidence.

24      So putting each of those facts together I think a

25 reasonable jury could determine that he did not take any efforts

1  prior to going to execute the warrant and leading the execution

2  team.

3          And regardless of whether we're proceeding under the

4  first path, which I think your Honor to find more plausible, or

5  the second path, defendant never argues that we would be able to

6  prevail if a jury were to make either of these sets of inferences.

7          Summary judgment for the Fourth Amendment claim and the

8  FTCA claim is based on -- premised on the idea that our facts are

9  not supported.  Respectfully, we think our facts are well

10  supported and a jury would be readily able to find that no

11  reasonable efforts were made, that the efforts that were made were

12  clearly unreasonable and insufficient under either path that we

13  propose.

14          Thank you.

15          THE COURT:  Thank you.

16          MS. LAMBERT:  Good morning, your Honor.

17          THE COURT:  Good morning.

18          MS. LAMBERT:  Lisa Lambert.

19          I want to start with the *Williams* case that Mr. Ross

20  cited.  That's the 314 F.App'x 253.  Now, in that case the

21  Eleventh Circuit specifically applied the private individual

22  standard to federal agents citing *Olson*.  So I want to make it

23  clear that under the FTCA we're not looking at how an officer

24  would be treated.  It's very clear in the statute and the cases

25  that analyze it the plain language says we must look at if a

1  private person would be liable, then the United States can be

2  liable.

3          And even in the *Williams* case they analyzed the use of

4  force in that case under the citizen's arrest statute that used to

5  be viable in the State of Georgia, which, of course, famously is

6  now repealed.

7          The other thing that I wanted to address off the bat was

8  what would be good faith as to a defense.  First, I don't believe

9  that there was an assertion of a good faith affirmative defense.

10  But where there's an arrest without a warrant and it has no legal

11  basis, there's no amount of good faith or probable cause that will

12  excuse the defendants.  And that is looking under a law

13  enforcement view if that was to be provided to them.  And that's

14  in our brief.  That's *Collins v. Sadlo.*

15          He also cited a case named *Denson*, which I was trying to

16  look up.  I didn't see that in the briefs.  I don't know that that

17  really helps with their argument because there -- that case

18  predates *Shivers*, which was recently decided by the Eleventh

19  Circuit.  The Supreme Court last month denied cert.  The argument

20  there by the plaintiff -- or, actually, the defendant was that

21  there could never be -- the exclusionary -- sorry, the

22  discretionary function exemption (sic) could never apply where you

23  also show that the officers violated a constitutional right.  And

24  in that Benson case -- or *Denson* case, which if I have the correct

25  cite, I have 574 F.3d 1318, there they argued both *Bivens* claims

1  and FTCA claims.  And the Court said, look, this is a companion

2  to -- the *Bivens* claims are a companion to the FTCA claims, and if

3  we find that the officers violated his Fourth Amendment rights,

4  then we're going to go ahead with the FTCA claims because you

5  can't violate a constitutional right.

6       So I haven't honestly had time to digest the entire

7  opinion, but based on the recent decision in *Shivers* that analysis

8  is no longer valid in this circuit, although I think it's valid in

9  the majority of the circuits around the country, and we preserved

10 that in our initial brief.

11      So as for the intentional torts under the law

12 enforcement proviso, which are not subject to the discretionary

13 exemption, there is no doubt that a private individual in the

14 State of Georgia can be liable for falsely imprisoning another

15 person.

16      Now, again, under the now defunct citizen's arrest law,

17 there were certain exceptions that would give them a way out.  And

18 those were very specific to that law.  And when you're looking for

19 a private person analog to what the law enforcement officers are

20 doing, it doesn't have to be exact, it has to be the same realm.

21      Sorry, I lost my place because I'm jumping around.

22      So under the exceptions for the false imprisonment

23 for a private individual, again, those were if you see somebody

24 commit -- a private individual can see somebody commit a

25 misdemeanor in their purview, they had knowledge of it, or if they

1  knew that somebody committed a felony and was trying to escape,

2  that's the law that's now repealed, that's when a private

3  individual could take these sorts of actions.  Other than those

4  exceptions that were outlined in that law, they could be liable

5  for falsely imprisoning another person.

6          Now, the same is true for assault and battery.  Any

7  private individual who assaults or batters another without some

8  limited justifications can be found liable in civil and probably

9  criminal court for those violations.  And for justification,

10 that's an affirmative defense not pled by the United States.

11         I think the good faith exception for the false

12 imprisonment applies limitedly to private individuals.  I think

13 the examples in some of the case law that you see are a shopkeeper

14 sees somebody suspicious, finds something, like it's on the

15 counter, two minutes later that person has their hand in their

16 pocket and the item is gone.  Well, is that a good faith reason to

17 stop that person and call the police?  Sure.  But without any --

18 none of these kinds of factors are present in the case here.  So I

19 don't think good faith applies.  Certainly as I said in the other

20 cite, it doesn't apply even if you look at it under a law

21 enforcement purview.

22         Now, as far as defense to assault and battery, again,

23 the justification is an affirmative defense.  One of the cites

24 that the United States cited in their brief or one of those

25 statutes was OCGA 16-3-21.  Well, that's the permission of use of

1  force if you're doing it in self-defense of yourself or others.
2  That's not factually accurate here.

3         Again, the reasonably necessary justification goes back
4  to the citizen's arrest law.  In *Williams* they said it was
5  reasonable force.  They had a valid warrant for a felony, chasing
6  this guy who was running away, and that's when the officer or the
7  agent hit him with the car.  None of those are factually similar
8  to here.  There was no valid warrant.  There was no felony
9  committed by any of the plaintiffs.  They were asleep at home in
10 their beds when all of this happened.

11        Another argument that was made in the briefing was that,
12 well, the force used against Mr. Cliatt was de minimis.  Well,
13 that's not a defense to battery in the State of Georgia by an
14 individual.  The *Hendricks* case says it could be an unauthorized
15 caress or a blow.  Any sort of unauthorized, unwelcomed touching
16 constitutes a battery in the State of Georgia.

17        And, finally, even if you look at it in the law
18 enforcement aspect, which, again, we don't think applies because
19 you have to look at the defenses that are available to a private
20 individual, but an arrest without a warrant and no legal basis,
21 you cannot use any force whatsoever.

22        Now, as for the discretionary function exception, we
23 took 30(b)(6) depositions of the FBI agents -- or for the FBI.
24 And they testified that at the point an agent has a warrant, a
25 search warrant, signed by a judge, that is a court order and they

```
 1  have no discretion whatsoever to do anything but what that warrant
 2  tells them to do.  So here there was an arrest warrant for
 3  Mr. Riley but there was also a search warrant for a specific home,
 4  which Mr. Greenamyre just went through the maps, we were looking
 5  at that house.
 6          THE COURT:  If I can, let me interrupt you.  You
 7  mentioned a good faith exception very briefly, and I think pretty
 8  quickly just to dismiss that as having much value here.  But why
 9  couldn't the good faith exception apply in the law enforcement
10  context?
11          MS. LAMBERT:  Well, I don't think it applies in the law
12  enforcement context under the FTCA because you need to look at it
13  through the lens of a private individual.  So if a good faith
14  defense were available to a private individual, which I think it
15  can be in, like I said, the shopkeeper sort of example, but,
16  again, it's an affirmative defense not pled by the United States,
17  and I don't think they meet it.  Based on all of the same reasons
18  that we think the Fourth Amendment claims summary judgment should
19  be denied, all of those factors can lead to that there was no good
20  faith.
21          THE COURT:  So if I deny -- let's say I don't agree with
22  your argument on Bivens, does that mean I should apply the good
23  faith exception here as to the other claims?
24          MS. LAMBERT:  Again, your Honor, I don't think it should
25  apply because they didn't plead it and they have burden of proof
```

```
 1  on that issue because it is an affirmative defense, right?  So, I
 2  mean, good faith is also -- I mean, so if you don't agree with the
 3  Bivens argument as to why they wouldn't get good faith, it's a
 4  lower standard.  It's more akin to negligence than the standard
 5  that would be under a constitutional violation.
 6          So one of the cases we cited was Blocker v. Clark.  And,
 7  you know, good faith implies due diligence.  We can show that --
 8  evidence of negligence, which is what Blocker says, you show any
 9  level of negligence, you're not going to get good faith.  It's a
10  lower standard.  It's not the same standard as under the Fourth
11  Amendment.
12          Just one more thing on Blocker.  He says, The failure to
13  exercise ordinary care is inconsistent with good faith.  And
14  further, whether or not there was due diligence or good faith
15  would apply, again, they would have the burden of proving it if
16  they had pled it, and also that would be a decision for the
17  fact-finder under Georgia law.
18          Back to the discretionary function exception.  Again,
19  the FBI testified that no discretion to do anything other than
20  what a warrant signed by a judge says you need to do.  So under
21  the Douglas case that we cited in our brief, the Eleventh Circuit
22  kind of pointed out that you can have an issue where there's one
23  level where it's discretionary for federal employees.  That one
24  involved the Bureau of Prisons, not FBI.  So they had discretion
25  in that case whether or not to put a prisoner in a certain pay
```

 1  grade, move him up the chain, discretion on where he would work,

 2  what jobs he would be given, that sort of thing.  But once they

 3  made the decision to raise his pay grade and put him in there,

 4  then the discretion was gone because under the regs they had to

 5  follow the set pay grade that this particular inmate was put into.

 6          Well, his supervisor or warden or somebody at the prison

 7  decided they didn't like it, they didn't want him to be in that

 8  pay grade and they started cutting his pay.  So the Eleventh

 9  Circuit found, well, while you initially were working under a

10  discretionary function exception, once the decision was made and

11  laid down, you no longer have discretion.  So at that point the

12  discretionary exception no longer applied.  And that's where we

13  contend here -- however Agent Guerra went about doing his research

14  before the day that he got the signed warrant from the judge to

15  execute at that house, we're not challenging that aspect, whether

16  he used Google Maps, Yahoo Maps, et cetera, satellite photos,

17  okay, whatever you did.  But once you got the directive from the

18  federal court, you have to go there.

19          And this is different from *Mesa* and *Figueroa* because

20  there both of those cases were for arrest warrants, not search

21  warrants.  And the issue there were identifying a person with the

22  wrong name, okay.  So same name, wrong person I think is the *Mesa*

23  case.  So the issue was what kind of -- what their discretion was

24  was how they went about locating this individual, which is a lot

25  different than a standalone home that's never moving.  And

1  *Figueroa* was the same thing, how do you go about finding an

2  individual?

3          The defendant mentioned the *Vivas* case.  And that was

4  actually -- I worked on that with Mr. Filipovits.  That case

5  settled before we got through discovery.

6          I agree Judge Ray followed the *Mesa* case in a motion to

7  dismiss, but what's important there is that he did not -- those

8  counts, it wasn't a complete dismissal, just certain counts under

9  the discretionary exception, it was without prejudice and letting

10  us do discovery in order to determine whether or not that even

11  applied.  We settled the case before we got to that point in

12  discovery.  So there's nothing else on that case there.

13          And then, finally, I just wanted to, again, acknowledge

14  that we know *Shivers* forecloses the argument that if you violate

15  the Constitution, you don't have any discretion to do so.  But

16  once again, we just want to preserve that for future appeals.

17          Thank you, Judge.

18          THE COURT:  All right.  Thank you, ma'am.

19          MR. ROSS:  I'll try to be brief because a lot of this is

20  addressed in our reply.

21          But starting with the *Norris* and *White* case, the

22  plaintiffs misunderstand the law.  As we cited in the *Corbitt*

23  case, unpublished opinions are relevant to whether law -- they can

24  decide whether law is not clearly established.

25          As the Eleventh Circuit explained in the *Gates* case, the

1  very fact that judges disagree about these things shows that it

2  has not been established beyond doubt to put officers -- every

3  reasonable officer on fair notice.  And that's why unpublished

4  decisions like *Norris* and *White* establish in this case that the

5  law was not -- that Agent Guerra did not violate clearly

6  established law.  And those cases are the best understanding I

7  think of what *Hartsfield* means.

8          The issue about the mailbox, the Court had asked some

9  questions about that.  The mailbox was on -- the picture that the

10 plaintiffs showed you was the target house.  For the plaintiff's

11 home, the mailbox was on a separate street, not on Landau Lane.

12 And even from the photograph that plaintiff's counsel took that

13 was put in the record, you can't even see during daylight hours

14 the mailbox.

15         The idea no matter how much amount of time it would take

16 for officers to run and go double-check a mailbox, every agent

17 testified in this kind of environment, high-risk, presence of

18 firearms, violent history suspect, their focus has to be on doors,

19 windows, entry and exit points.  It's not part of the calculus to

20 go out of the way and expose yourself when you're already in a

21 vulnerable position where every second matters.

22         We talked about the Geolocation information in our

23 brief.  But as Agent Guerra testified, the Geolocation information

24 on the suspect Riley is not a navigational tool.  It's a tool that

25 the case agent would use.  In this case there were several case

1  agents that also had access to it.  And it all confirmed that he

2  was at the address that we thought he was at.  Therefore, the idea

3  that Agent Guerra should have been checking Geolocation

4  information is just inconsistent and directly contradicted by the

5  evidence.

6       The black Camaro, it was parked on the driveway on a

7  separate street for Agent Guerra and Agent Lemoine to go observe

8  it.  They would have had to drive out of their way onto a dead-end

9  street and have to circle back around, all while they're trying to

10 minimize their presence in this area.  So the idea that that would

11 have occurred, there's no evidence that that would have been a

12 reasonable step that any of them would have taken.

13      And, furthermore, the evidence showed that Mr. Riley,

14 the suspect here, dealt in vehicles, so it would not have been

15 uncommon for a different vehicle to be in his driveway.  So what

16 Agent Thompson said, who was the case agent for Riley's arrest, it

17 didn't stand out one way or the other to him.

18      Plaintiffs say that Agent Guerra had inaccurate

19 testimony.  They talk about how Agent Guerra had previously

20 testified in a declaration that he thought he did the site survey

21 with Agent Donovan.  Agent Donovan likewise thought he did the

22 site survey with Agent Guerra, and that is two years after the

23 fact.  And they were just simply wrong.  It's not evidence that

24 the site survey didn't occur, it just established that they

25 thought they did them together because they did so many of them

1  together.

2        Talking about Agent Guerra's site survey photos, we know

3  for a fact those photos were taken before the warrant execution

4  because they show the paint color on the suspect's home before the

5  warrant execution because after the warrant execution the suspect

6  painted the door a different color.  It was black/dark blue prior

7  to the warrant execution.  It was gray after the warrant

8  execution.  Agent Guerra's site survey photos are of a home with a

9  black door, dark blue.  And we also know that they're not the same

10  photos that were taken by Agent Thompson because they were not

11  included in Thompson's photos.  And also, Thompson's photos show a

12  hang tag on the front door, whereas Agent Guerra's don't.

13  Plaintiffs are relying purely on speculation and conjecture.

14  There's no evidence that the site survey and the drive-by did not

15  occur.

16        For the drive-by, Agent Lemoine testified that it

17  occurred.  And even as the Geolocation data that plaintiff showed

18  you, it shows that during the time period where he and Agent

19  Guerra said that they did the site survey, it shows that he left

20  the staging area and it was consistent with the fact that the

21  drive-by occurred during that time period.

22        Furthermore, they both testified to using the black

23  Camaro during the staging briefing with the other agents.  And

24  they would not have known about the black Camaro had they not done

25  the drive-by.

1          For the site survey itself, Agent Guerra, again,

2   testified to doing it.  Agent Donovan, who had done numerous site

3   surveys with Agent Guerra, testified that it was Agent Guerra's

4   practice to do it.  Agent Guerra made written tactical notes from

5   his site survey.  And he chose the staging location during the

6   site survey, which Agent Donovan also testified would have been

7   the time where you would choose the staging location.

8          We go through in our reply brief all the similarities

9   between the homes that is not common of the neighborhood.  And I

10  think another important part that the plaintiffs don't address

11  this, even if the Court wanted to disregard that the site survey

12  or the drive-by occurred, Agent Guerra still did more than what is

13  established by *Hartsfield* and consistent with *Norris* and *White*.

14  Even if you did not consider the site survey and the drive-by, he

15  still reviewed the operation order and the SWAT addendum, which

16  included the photographs, the map and the directions.  He

17  attended -- just like the officer in *Norris*, he attended an

18  operational brief prior to the warrant execution.  And then at the

19  staging area prior to the warrant execution he briefed the other

20  agents on the target location, passed around photographs.  And

21  each agent who was asked about it testified that they were

22  provided the address.

23          With respect to the FTCA claims, plaintiffs are trying

24  to impose a strict liability standard, which, again, is not

25  permissible.  Ms. Lambert talked about the Denson case.  We did

1   not cite it in our briefs but plaintiff cited in their briefs.

2   And in that case what the Court is saying is that the supremacy

3   clause precludes this idea that federal law enforcement officers

4   or federal officials who comply with federal law can somehow be --

5   impose liability on the United States if their conduct does not

6   conform to that of a private citizen.

7           The *Shivers* case is a published binding opinion, so I

8   don't know that we need to talk about that much further.

9           The plaintiffs, again, today and in their brief they

10  talk a lot about how the citizen's arrest law had been repealed.

11  It was repealed in 2021.  It was valid at the time of the incident

12  at issue.  To hold that against -- the repeal against Agent Guerra

13  would be a violation of the Georgia Constitution and the US

14  Constitution under the ex post facto doctrine.  And it would be

15  holding against the United States as opposed to Agent Guerra.

16          Plaintiffs do not cite any case in their briefs that

17  actually support this argument that we waived the ability to argue

18  justification or good faith.  In addition, we did plead failure to

19  state a claim.  Subject matter jurisdiction, it's not waivable.

20  And it's part of their burden to prove that the conduct was

21  unlawful, so there's no waiver of those defenses.

22          For the discretionary function exception, again, the

23  *Vivas* case, *the Mesa* case, the *Figueroa* cases, those all are cases

24  that involved warrants.  The notion here because this case

25  involves a warrant the discretionary function exception doesn't

1  apply is inconsistent with case law.  And plaintiffs have not

2  cited any case that supports that proposition.

3          Additionally, under the discretionary function exception

4  you look at the nature of the conduct involved.  As the rule

5  provides, it doesn't matter whether the discretion involved has

6  been abused.

7          The *Douglas* case that plaintiff cites has really nothing

8  to do with this case.  That was a case where an inmate had vested

9  rights and the Bureau of Prisons could not withhold wages to him

10 because he had vested in the program.

11         The *Vivas* case, again, we talked about -- but that was a

12 motion to dismiss.  We've already done discovery in this case, so

13 I don't know that the fact that that case ultimately settled has

14 any -- it doesn't make sense to me that it would have any

15 relevance.

16         THE COURT:  As far as the citizen's arrest statute, how

17 are you using that as a comparable here?

18         MR. ROSS:  It's comparable because a citizen has the

19 right to use reasonable force to detain someone suspected of a

20 crime.  Here we're trying -- you have to extrapolate it more to

21 a law enforcement situation because clearly a citizen does not

22 execute a warrant at a person's home.  But the idea is that if

23 you're going to apply private person law -- and we cited private

24 person law in our cases -- is that false imprisonment, assault and

25 battery, there are defenses, justification and good faith, that

```
1  are met here if you're going to apply it purely in this kind of
2  ambiguous private person situation where even though this is
3  really uniquely government function what the Supreme Court has
4  instructed us to do is find the closest parallel.  But then the
5  other cases which we cited --
6          THE COURT:  What's the closest parallel law, do you know
7  offhand?
8          MR. ROSS:  The cases?
9          THE COURT:  Right.  Because I get your point.  I mean,
10 you're told, okay, the rules here are as a private citizen, we're
11 looking at -- is it Counts 1 and 2?
12         MR. ROSS:  Yes, your Honor.
13         THE COURT:  But obviously this is execution of a
14 warrant.  So you then, what's the closest thing on a private
15 citizen, and that's how you arrived at the citizen arrest?
16         MR. ROSS:  That's how the *Williams* court did it.  The
17 *Williams* court -- or the Eleventh Circuit in *Williams*, they looked
18 at both the citizen's arrest law and the law enforcement specific
19 cases.  Generally speaking, cases in this realm look at citizen's
20 arrest law but really -- there's not really a great way to do it.
21         The Fifth Circuit in *Villafranco v. United States*, 587
22 F.3d 257, it specifically talks about how -- because there's not
23 a particularly close parallel, that's why you look at law
24 enforcement privileges.  The concurrences in the *Techla* case that
25 the plaintiffs cite talks about that.  There's a *Valdez* case out
```

```
 1   of the Western District of Michigan that actually applies state

 2   immunities to law enforcement officers.

 3          But the general idea is that if you were even going to

 4   look at just specific private persons law, private persons have a

 5   right to use reasonable force to detain someone suspected of a

 6   crime.  And the force here was de minimis, which we cite the

 7   de minimis case law to show that it was reasonable --

 8          THE COURT:  Are those summary judgment cases?

 9          MR. ROSS:  Which cases, your Honor?

10          THE COURT:  Well, I mean, if I accept your analog of

11   citizen's arrest in a private person context is comparable to a

12   government agent executing an arrest warrant, then I still have to

13   ask myself, okay, we're at summary judgment here.  And do you have

14   any cases that at a summary judgment stage have granted summary

15   judgment in those contexts?

16          MR. ROSS:  Yes, your Honor.  I believe all the cases we

17   cited are summary judgment cases.  And what the courts say, and we

18   cited I believe the *Purcell* case and there's a couple other cases

19   that say when there's no evidence of bad faith, then the Court can

20   grant summary judgment.  And same here.  The undisputed evidence

21   does show diligence.  I understand the plaintiffs wants them to

22   have done more, but the Eleventh Circuit said that's not the

23   inquiry, the inquiry is whether they did enough.

24          I believe the cases we cited were Wal-Mart cases that

25   were summary judgment cases, but I don't know the particular cite
```

1  offhand.

2          THE COURT:  Okay.  All right.  And what about the

3  actions and justification, does that play a part here, how the

4  actions were justified?

5          MR. ROSS:  Yes.  In the sense that the force -- the

6  actions were justified, they were reasonable and they were in good

7  faith because of the circumstances at hand.  The agents entered

8  the home believing that a violent suspect was in that home based

9  on all the intel, the operation and planning.  They have a right

10  under Supreme Court authority to detain the occupants of a home

11  during a search warrant.

12          And the case we cited, I believe the *Muehler* case, the

13  homeowners, the plaintiffs were detained for two to three hours

14  and that was still reasonable.  Here we're talking a few minutes.

15  And they thought they were in a home that had weapons.  Mr. Cliatt

16  admits that he advised there was a shotgun in the home.  They had

17  the right to detain Mr. Cliatt and Ms. Martin to determine for

18  their own safety until they realized their mistake, at which point

19  they uncuffed Mr. Cliatt and immediately left the home.

20          THE COURT:  All right.  Are you through?  I don't want

21  to interrupt you.

22          MR. ROSS:  Yes, your Honor.

23          THE COURT:  I want to ask Ms. Lambert a question, but

24  it's your motion so I'm going to give you the last word.

25          Ms. Lambert, what do you say to the argument that the

1  citizen's arrest statute, yes, it's been repealed but it wasn't

2  repealed when all this was going on?

3          MS. LAMBERT:  No, we agree that it was not -- it was

4  still in effect at the time that the raid took place on our

5  clients' home.

6          THE COURT:  So why even mention to me that it's been

7  repealed?  What relevance is that to this case?

8          MS. LAMBERT:  I mean, it's just a fact, your Honor.  I

9  mean I think --

10         THE COURT:  An irrelevant fact for this case?

11         MS. LAMBERT:  Is it -- no, your Honor.

12         THE COURT:  How is it relevant?

13         MS. LAMBERT:  I said, no, your Honor.  I apologize, it's

14  not relevant.

15         THE COURT:  All right.  Anything else on that point?

16         MR. ROSS:  No, your Honor.

17         THE COURT:  All right.

18         The last thing I want to make sure that I run down

19  before we leave today is whether or not this defense has been

20  specifically pled.

21         Ms. Lambert you say they haven't.  Mr. Ross, you say you

22  have.  So this should -- of all the things I need to figure out,

23  this is one that should be pretty easy to figure out.  So help me

24  understand that argument a little bit more.  I think he's saying,

25  yes, we did plead it.  And you're saying, no, we didn't.  So help

 1  me out here, counsel.

 2          MS. LAMBERT:  Okay.  So in United States' answer, which

 3  was filed separately from Agent Guerra's answer, there is eight

 4  affirmative defenses:  Failure to state a claim; failure to

 5  exhaust administrative remedies; no jury trial; no punitive

 6  damages; no damages in excess of the claim that we filed;

 7  discretionary function exception; number seven is the answers to

 8  our paragraphs; and number eight is a general denial.  Nowhere in

 9  those eight defenses does it say good faith, justification or the

10  other defenses that we talked about today that are affirmative

11  defenses.

12          Now, in the reply brief, the United States said they --

13  it pled the affirmative defense of failure to state a claim.

14  Well, that's a failure of us to state a claim, not their defense

15  to our claim if they don't get past a 30 -- a 12(b)(6) or past

16  summary judgment.  And, frankly, they have to put in their

17  affirmative defenses to put us on notice so that we can do

18  adequate discovery to prepare to defend against those.  They can't

19  import them at the last minute right before trial or at summary

20  judgment.

21          Now, they also -- the United States said in its reply

22  brief -- so our position is failure to state a claim is a wholly

23  different defense than a specific defense to the torts that we

24  alleged against the United States.  So that's number one.

25          Number two, in the reply brief the United States said

1    that Agent Guerra put us on notice in his motion to dismiss that

2    he would claim an honest mistake, but that's Agent Guerra's motion

3    to dismiss the Fourth Amendment claims against him.  That's not

4    applicable to the United States' defenses to the claims against

5    it.  So --

6                THE COURT:  Okay.  Thank you.

7                Ms. Ross.

8                MR. ROSS:  Yes, your Honor.

9                They've not cited one case that supports the proposition

10   that we've waived our defenses.

11               Additionally, we're talking Federal Rules of Civil

12   Procedure versus Georgia Rules of Civil Procedure.  The notion

13   that the plaintiffs were not on notice that we contended the

14   conduct was reasonable and justified defies logic.  The United

15   States in its answer did raise failure to state a claim as

16   affirmative defense.  The cases that they cite -- and I can't

17   remember if it was the *Stewart v. Williams* case or perhaps the

18   *Blocker* case -- it didn't say that the defendant had a failure --

19   waived a defense, it just said that the defendant hadn't proved

20   his defense.

21               And, again, we took discovery on all the facts of the

22   case, the reasonableness and the good faith, the justification.

23   There's no -- there's nothing that wasn't uncovered that would be

24   relevant to these defenses as we've raised them.

25               THE COURT:  Okay.  All right.  Thanks, everyone.  Good

1  to see all of you.

2          Ms. Oduka, thank you.

3          Ms. Coudriet, thank you.

4          To our court security officer, I appreciate your help

5  this morning as well.  Everyone take care.

6          MS. LAMBERT:  Your Honor, I'm sorry, I just have one --

7  unrelated to the summary judgment.  So we bifurcated the expert

8  provisions from regular discovery and saved time, saved obviously

9  money because experts are expensive.  The expert that we want to

10 retain has a three-month waiting list, so I just wanted to -- we

11 just wanted to bring it to the Court's attention.  I don't know if

12 that's really going to impact if we go out and write her a check

13 this week, but I just wanted to raise that issue.

14         THE COURT:  Okay.  What's your question for me?

15         MS. LAMBERT:  Well, I guess the question would be,

16 depending on when the order comes out and, of course, obviously

17 what the order is, would there be a possibility to extend the time

18 for the expert discovery?

19         THE COURT:  What's the current time frame, and what do

20 you think you would need?

21         MS. LAMBERT:  Right now she's booked until August.

22         THE COURT:  I looked at a lot of things in this case

23 before this hearing, but I didn't look at your discovery periods.

24         MS. LAMBERT:  Mr. Filipovits is pulling it up.

25         So the order that -- for the bifurcated discovery

 1  says -- that's Doc 69 in our docket -- within 25 days of denial
 2  of summary judgment, plaintiff shall serve their expert report.
 3  Within 40 days of denial of summary judgment, defendants shall
 4  take the deposition of our expert.  And then 55 days from denial,
 5  defendants serve their rebuttal report, if any.
 6          THE COURT:  Understood.
 7          Well, Mr. Ross, it seems like a reasonable request to
 8  extend that.  Any disagreement?
 9          MR. ROSS:  We don't have any objection.
10          THE COURT:  Okay.  These cases do have some age on them,
11  which I'm concerned about, so I'm reticent to really kick things
12  back too much.  Why don't you submit me a proposal that maybe
13  kicks that first date back a little bit, which I think is the one
14  that is most bothersome to you.  Is that right?
15          MS. LAMBERT:  Yes, your Honor.
16          THE COURT:  See if y'all can have a pow-wow and figure
17  out how you might push that first date back but still keep all the
18  other dates as tight as they are, pretty close to as tight as they
19  are.  And then I'll look at that with open ears.  All right?
20          MS. LAMBERT:  Okay.
21          THE COURT:  Thanks, everyone.  Y'all take care.
22          (PROCEEDINGS REPORTED WERE CONCLUDED at 11:20 A.M.)
23                    _____
24
25

1                    C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT

4   NORTHERN DISTRICT OF GEORGIA

5

6      I do hereby certify that the foregoing pages are a true and

7   correct transcript of the proceedings taken down by me in the case

8   aforesaid.

9      This the 12th of December, 2022.

10

11

12

13

14          _____

15                    PENNY PRITTY COUDRIET, RMR, CRR
                       OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25